**UNITED STATES of America, Plaintiff,**

v.

**Dean KIRKLAND, Gary Kirkland, and Robert Legino, Defendants.**

**No. CR 02–350–BR.**

United States District Court, D. Oregon.

June 15, 2004.

Karin J. Immergut, United States Attorney, Neil J. Evans, Assistant United States Attorney, Portland, OR, William B. Jacobson, United States Department of Justice, Washington, DC, for Plaintiff.

Robert S. Bennett, Saul M. Pilchen, James Howard, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Defendant Dean Kirkland.

Stephen A. Houze, Portland, OR, for Defendant Gary Kirkland.

James G. Rice, Portland, OR, for Defendant Robert Legino.

### OPINION, FINDINGS, AND VERDICTS

BROWN, District Judge.

Capital Consultants, Inc. (CCI), was a Portland investment firm that went into receivership in September 2000. CCI managed investments for various union employee pension benefit plans and welfare benefit plans subject to 18 U.S.C. § 1954. When CCI failed, the plans suffered catastrophic financial losses, which, in turn, resulted in significantly reduced union pensions for countless retired workers and produced extensive civil litigation and multiple criminal investigations and prosecutions. As a result of the criminal investigations, the Grand Jury indicted Dean Kirkland, Gary Kirkland, and Robert Legino on August 22, 2002, and charged them with various criminal acts.

Dean Kirkland was the principal salesperson with CCI. Gary Kirkland is Dean Kirkland's father and was a trustee and a co-chairman of the trusts of two plans based in Portland, Oregon, that invested funds under the management of CCI: the 401(k) Retirement Fund of the Office of Professional Employees International Union (OPEIU), Local 11, and the Western States Local Union Trust Fund of the OPEIU. In addition, Gary Kirkland was a

trustee and co-chairman of the Western States Pension Trust. Robert Legino was a trustee of the trusts of three plans based in Denver, Colorado, that invested funds under the management of CCI: the International Brotherhood of Electrical Workers (IBEW) Eighth District Electrical Pension Plan, the IBEW Eighth District Electrical Pension Fund Annuity Plan, and the Electrical Industry Benefit Vacation and Paid Holiday Fund (collectively, the Eighth District plans). Legino also was a co-chairman of the Pension Plan.

On September 8, 2003, the Grand Jury issued a 57–Count Second Superseding Indictment in which all Defendants are charged in multiple counts with illegally giving or receiving gratuities in violation of 18 U.S.C. § 1954. In addition, Dean Kirkland is charged in multiple counts with wire fraud in violation of 18 U.S.C. § 1343 arising from his submission to CCI of false claims for reimbursement of business expenses. Finally, Dean Kirkland is charged in a single count with obstruction of justice in violation of 18 U.S.C. § 1503 arising from his conduct in response to the Grand Jury investigation. The Second Superseding Indictment also includes two forfeiture counts: one against Dean Kirkland and Gary Kirkland and one against Dean Kirkland only.

This case was tried to the Court beginning April 20, 2004. After hearing testimony from 43 witnesses and receiving voluminous exhibits, the Court took the matter under advisement on May 11, 2004. Having weighed and evaluated all of the evidence and, after applying the same standards as required of a jury when making findings of fact and reaching a verdict in a criminal case, the Court renders the following Verdicts:

As to **Dean Kirkland**, the Court finds Defendant is **NOT GUILTY** of illegally giving gratuities to Robert Legino as charged in Counts 1 and 2; is **NOT GUILTY** of illegally giving gratuities to Gary Kirkland as charged in Counts 3, 12, 13, 14, 16, 19, 20, and 21; is **NOT GUILTY** of illegally giving a gratuity to Blaine Newman as charged in Count 10; and is **NOT GUILTY** of illegally giving gratuities to Robert Mayhew as charged in Counts 10, 14, and 18.

The Court also finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of illegally giving gratuities to John Lontine as charged in Counts 4, 7, 11, and 15; is **GUILTY** of illegally giving gratuities to Robert Legino as charged in Counts 5, 8, 10, 14, 17, and 19; is **GUILTY** of illegally giving gratuities to Dennis Talbott as charged in Counts 9, 10, and 14; is **GUILTY** of wire fraud as charged in Counts 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, and 54; and is **GUILTY** of obstruction of justice for lying to federal agents on October 20, 2000, as charged in Count 55.

As to **Gary Kirkland**, the Court finds Defendant is **NOT GUILTY** of illegally receiving gratuities as charged in Counts 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, and 41.

As to **Robert Legino**, the Court finds Defendant is **NOT GUILTY** of illegally receiving gratuities as charged in Counts 22, 23, 24, 25, 26, 27, 28, and 29.

As to Forfeiture Counts 56 against Gary Kirkland and Dean Kirkland and Count 57 against Dean Kirkland only, the Court will conduct further proceedings in due course.

### WIRE FRAUD: COUNTS 42–54[1] AGAINST DEAN KIRKLAND

**I. *The Law***

18 U.S.C. § 1343 provides:

---

1. At the close of the government's case-in-chief, the Court granted Dean Kirkland's Motion for Judgment of Acquittal pursuant to Fed.R.Crim.P. 29 on Count 50.

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purposes of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

■ "To convict a defendant of wire fraud, the government must prove [beyond a reasonable doubt] that a defendant (1) participated in a scheme to defraud; and (2) used the wires to further the scheme." *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir.2000) (citation omitted).

The government also must prove beyond a reasonable doubt the defendant's specific intent to commit the crime. *Id.* at 1083. In addition, the government must prove beyond a reasonable doubt that the falsehood giving rise to the scheme to defraud was material. *Neder v. U.S.*, 527 U.S. 1, 22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

As to each of the wire fraud counts against Dean Kirkland, therefore, the government must prove beyond a reasonable doubt the following elements:

1. Dean Kirkland made up a scheme to defraud CCI to obtain money or property by making false statements in his claims for business expense reimbursements,

2. Dean Kirkland knew the statements were false,

3. The statements were material because they would reasonably influence CCI to authorize the payment of money to Dean Kirkland,

4. Dean Kirkland acted with the intent to defraud CCI, and

5. Dean Kirkland used interstate wires to carry out an essential part of the scheme to defraud.

## II. *Elements 2 and 3.*

Dean Kirkland concedes Element 2 as to all of the wire fraud counts. In any event, the Court finds beyond a reasonable doubt that each of Dean Kirkland's statements underlying each of the wire fraud counts was false.

■ In addition, as to Element 3, the Court finds beyond a reasonable doubt that each of Dean Kirkland's false statements was material because, in fact, each false statement influenced CCI to authorize the payment of money to Dean Kirkland.

Accordingly, the Court finds beyond a reasonable doubt that the government has proved Elements 2 and 3 of each wire fraud count.

## III. *Elements 1 and 4: Intent to Defraud.*

■ As detailed below, Dean Kirkland admits he made a false reimbursement statement in connection with each wire fraud count. As to Elements 1 and 4 of each wire fraud count, however, Dean Kirkland denies he "made up" any "scheme to defraud" CCI and denies he had any intent to defraud CCI because Jeffrey Grayson, the founder, principal owner, and chief executive of CCI, allegedly approved each false reimbursement claim in advance. According to Dean Kirkland, Jeffrey Grayson did so to compensate Dean Kirkland with money and property over and above his considerable base salary and commissions, which, by the end of his employment at CCI, were approximately $1 million a year and were

separate from and in addition to his legitimately reimbursable business expenses. Thus, although Dean Kirkland's admissions support a finding that he participated in a "scheme" to submit false reimbursement claims to CCI, the government still must prove beyond a reasonable doubt that this was a "scheme to defraud CCI" (Element 1) and that Dean Kirkland acted with the "intent to defraud" CCI (Element 4). For purposes of the Court's analysis under the circumstances of this case, these elements merge.

The Court summarizes the government's wire fraud allegations and Dean Kirkland's pertinent admissions and other testimony on a count-by-count basis as follows:

The government alleges Dean Kirkland falsely represented to CCI on January 8, 1998 (Count 42); January 14, 1998 (Count 43); and January 12, 1998 (Count 44), that the purpose of the expenses for which he claimed reimbursement on each of these dates was a "client raffle." Dean Kirkland admitted he used these false "raffle" entries to obtain reimbursement for a Freedom Arms Revolver (Counts 42 and 43) [2] and a pair of Swarovsky binoculars (Count 44). In addition, Dean Kirkland conceded he did not purchase any of these items for a client raffle, he received reimbursement for each of them, and he kept them as personal property. He testified, however, he submitted these false expense reports only with Jeffrey Grayson's express, knowing, and advance approval.

In Count 45, the government alleges Dean Kirkland falsely represented to CCI that he purchased artwork as an anniversary gift for Robert Legino and his wife. In fact, Dean Kirkland admitted he used this false entry to obtain reimbursement for his personal purchase of another handgun in May 1998. When asked why he did not use a false "client raffle" entry to support this reimbursement claim, Dean Kirkland testified Jeffrey Grayson counseled him against describing all such false entries as "client raffles" because "you can only have so many raffles or fundraisers." Instead Dean Kirkland claims Jeffrey Grayson told him to "put it [the purchase of the handgun] down as a dinner or something else and just let me know ahead of time."

In Count 46, the government alleges Dean Kirkland falsely represented to CCI on August 1, 1998, that he purchased a shotgun for a union client. In fact, Dean Kirkland admitted he used this entry to claim reimbursement for the personal purchase of a Marlin rifle on August 1, 1998, on the occasion of his son's birth. In Count 47, the government alleges Dean Kirkland falsely represented to CCI on August 12, 1998, that he purchased a second Marlin rifle for a "client raffle." Dean Kirkland admitted he used this entry to claim reimbursement for the personal purchase of a second Marlin rifle to match the one he obtained earlier for his son.

Although Dean Kirkland conceded these reimbursement claims also were false, he maintained Jeffrey Grayson authorized each of them in advance. In fact, Dean Kirkland testified he bought the two Marlin rifles at Jeffrey Grayson's suggestion "to go out and get something nice" that he could share with his son when he was older.

In Count 48, the government alleges Dean Kirkland falsely represented to CCI that he spent $677 on October 4, 1999, for dinner with clients. Again, Dean Kirkland admitted he made this false entry and CCI "reimbursed" $677 to him based on that

---

**2.** The government charges Dean Kirkland in each of Counts 42 and 43 with making false reimbursement claims for a "Freedom Arms Revolver." Dean Kirkland, however, testified, and the Court finds, he made two false reimbursement claims to pay for one Freedom Arms handgun.

false entry. Dean Kirkland testified, however, that Jeffrey Grayson authorized this false submission.

In Count 49, the government alleges Dean Kirkland falsely represented to CCI that he spent $3,426 for membership dues to the Minnesota Horse and Hunt Club on November 26, 1999. Dean Kirkland admitted he altered an invoice submitted with his expense reimbursement claim of November 1999 by inserting a "3" in front of the actual amount to obtain $3,000 in cash to purchase three Browning shotguns, again purportedly with Jeffrey Grayson's approval.

In Count 51, the government alleges Dean Kirkland falsely represented to CCI on March 31, 2000, that he spent $2,543 for a fishing trip to Pesca, Panama. Dean Kirkland admitted he created this false receipt. He testified he did so to obtain funds to purchase two Weatherby rifles for Robert Legino and Robert Mayhew to use on a future hunting trip.[3] Again Dean Kirkland maintained Jeffrey Grayson approved this false claim in advance.

In Count 52, the government alleges Dean Kirkland falsely represented to CCI that he purchased a gas barbeque on May 22, 2000, for a client raffle. In fact, Dean Kirkland admitted he obtained the gas barbeque, a cart, and cover for his personal use. Although Dean Kirkland denied he falsely coded the receipt for this expense as a "raffle," he conceded CCI reimbursed him for this expense on that basis. In any event, Dean Kirkland testified Jeffrey Grayson told him "to go buy myself a nice grill and so I did."

In Count 53, the government alleges Dean Kirkland falsely sought reimburse-

ment from CCI on July 31, 2000, for a client outing. In fact, Dean Kirkland admitted he used this false entry to obtain reimbursement for a new snowmobile trailer. Although Dean Kirkland testified he did not direct this entry to be coded as a "client outing," he claims he obtained Jeffrey Grayson's advance approval for the trailer purchase. According to Dean Kirkland, Jeffrey Grayson authorized him to seek reimbursement for one-third of the cost of the trailer because he sometimes took clients on snowmobile outings.

In Count 54, the government alleges Dean Kirkland created a false receipt on July 31, 2000, for a client outing. In fact, Dean Kirkland admitted he used this false entry to obtain $1,430, which, in turn, he used to purchase another Weatherby rifle for a future hunt. Dean Kirkland contended, however, Jeffrey Grayson authorized this false submission.

Thus, although Dean Kirkland generally admitted he knowingly submitted false statements for expense reimbursements as alleged in each of the wire fraud counts, he asserted Jeffrey Grayson explicitly approved each false submission in advance. Dean Kirkland maintained, therefore, he did not act with any intent to defraud CCI and, at a minimum, his testimony concerning his claimed agreement with Jeffrey Grayson creates reasonable doubt as to this element of the wire fraud counts. The Court, however, finds little, if any, substantive evidence to corroborate Dean Kirkland's testimony in this respect, and, in any event, the Court finds his testimony is not credible as to many material issues.

Jeffrey Grayson is not available to testify.[4] Neither Shelly Connover, Dean Kirk-

---

3. These Weatherby rifles are also the subject of Counts 17, 18, and 28.

4. On April 23, 2002, Jeffrey Grayson pled guilty to one count of Mail Fraud in violation of 18 U.S.C. § 1341 and one count of Aiding

in the Preparation of a False Tax Return in violation of 26 U.S.C. § 7206(2). In his Plea Agreement, he agreed to cooperate with the government in its ongoing criminal investigations. Shortly thereafter, however, Jeffrey Grayson suffered a stroke that rendered him

land's former secretary, nor Barclay Grayson, who is Jeffrey Grayson's son and was president of CCI from January 1999 until September 2000, the period that encompasses the acts charged in Counts 48–54, corroborated any such special agreement between Jeffrey Grayson and Dean Kirkland. The only remaining evidence that could support Dean Kirkland's account was testimony by Hal Porter, who was President of CCI from 1995 until January 1999, the period that encompasses the acts charged in Counts 42–47.

Porter testified he discussed false "client raffle" entries with Jeffrey Grayson. Based on these discussions, it was Porter's understanding that Jeffrey Grayson had sometimes "approved" the use of false "raffle" entries for business expenses that were otherwise deductible. Porter recalled one instance when Jeffrey Grayson approved a false "client raffle" entry, which, in fact, was to reimburse Dean Kirkland for a cash political contribution.[5] Porter, however, was not aware of any instance when Jeffrey Grayson approved reimbursement based on a receipt "with false information on the back of it, or the front of it for that matter." Nonetheless, there is overwhelming evidence that, at least until sometime in 1999, Dean Kirkland routinely supported his expense reimbursement claims with receipts on which he wrote detailed false information. At best, Porter's testimony merely supports Dean Kirkland's claim that Jeffrey Grayson permitted the use of false "client raffle" entries in order to write off CCI business expenses that were otherwise legitimately deductible such as a political

contribution. The Court, however, finds Porter's testimony does not show Jeffrey Grayson authorized Dean Kirkland to use false entries in expense reports in order to be reimbursed for expenses unrelated to any CCI business purpose or to obtain money or property for his personal gain. The Court, therefore, concludes Porter's testimony does not corroborate Dean Kirkland's account.

As to whether Jeffrey Grayson authorized Dean Kirkland's false expense reports, therefore, the Court is left with only Dean Kirkland's testimony. The Court observed Dean Kirkland's demeanor throughout this lengthy trial, took into account his significant interest in the outcome of the case, and took care to evaluate the nature and quality of his testimony in light of all of the other evidence in the case and the fact that the government was unable to produce Jeffrey Grayson as a witness. In short, the Court finds Dean Kirkland's testimony was not credible as to many material issues. Three clear examples of Dean Kirkland's lack of candor concerning the wire fraud counts in general occurred during his cross-examination about the expense reports underlying Counts 49, 51, and 53.

As noted, as to Count 49, Dean Kirkland admitted he altered an invoice submitted with his expense reimbursement claim of November 1999 by inserting a "3" in front of the actual amount to obtain $3,000 in cash. On direct examination, Dean Kirkland testified these funds were reimbursements for the purchase of three Browning shotguns. On cross-examina-

---

incompetent and unable to proceed to sentencing or to fulfill his agreement to cooperate. On May 26, 2004, therefore, the government filed a Motion to Dismiss All Charges against Jeffrey Lloyd Grayson due to "his extraordinary mental and physical impairment and inability to participate in legal proceedings." The Court issued an Order on

June 2, 2004, granting the government's Motion.

5. Consistent with the government's theory, this false reimbursement entry that Jeffrey Grayson apparently approved was not charged in the Second Superseding Indictment.

tion, however, the government established Dean Kirkland also submitted an earlier false expense claim in October 1999 for one Browning shotgun and a later false expense claim in December 1999 for two additional Browning shotguns. Thus, Dean Kirkland submitted expense reimbursement claims for six such shotguns during this period. Notably, ATF records for the same time reflect Dean Kirkland purchased only three Browning shotguns. Although Dean Kirkland presented as a confident and articulate witness during much of his direct testimony, his demeanor changed dramatically during cross-examination when he was confronted with the obvious double, false expense reimbursement claims for the purchase of the same Browning shotguns. In short, the Court finds Dean Kirkland's testimony was not credible when he tried to reconcile the irreconcilable by suggesting he also might have purchased three used[6] Browning shotguns during this same period in addition to the three new Browning shotguns.

As noted, as to Count 51, Dean Kirkland admitted he created the false "Pesca Panama" receipt. On direct examination, Dean Kirkland testified he created this receipt to support a $2,543 reimbursement claim in March 2000 for the purchase of two Weatherby rifles for Robert Legino and Robert Mayhew to use on a future hunting trip. On cross-examination, however, Dean Kirkland conceded he also obtained $3,800.01 reimbursement for three Weatherby rifles two months earlier in January 2000. Thus, Dean Kirkland submitted false expense reimbursement claims for five Weatherby rifles during this period, but ATF records only confirm Dean Kirkland purchased three of them during this time. While Dean Kirkland attempted to explain this additional, obvious discrepancy, he continued to display a strained de-

meanor. Again, the Court finds this testimony was not credible.

As to Count 53, Dean Kirkland testified on direct examination that Jeffrey Grayson authorized him to obtain reimbursement from CCI for one-third of the cost of a snowmobile trailer valued at $7,000. Dean Kirkland traded in his used trailer and received a $2,200 credit against that purchase price. Dean Kirkland testified Jeffrey Grayson then agreed CCI would reimburse Kirkland for one-half of the $4,800 balance. On cross-examination, Dean Kirkland admitted he submitted an expense report dated August 1, 2000, in which he falsely sought reimbursement of $2,400 for a "client outing" when his actual purpose was to obtain what he contended was CCI's share of the trailer purchase price. The government, however, confronted Dean Kirkland with another $2,400 expense reimbursement claim submitted in September 2000 for "office equipment." Dean Kirkland testified this entry "could be" another claim for the same $2,400 balance of the cost of the trailer. Although Kirkland tried to explain this inconsistency by suggesting the second $2,400 claim "could have been a mistake," the Court finds this testimony was not credible.

Having found Dean Kirkland's testimony was not credible as to Counts 49, 51, and 53, the Court does not credit any of Dean Kirkland's testimony concerning the remaining wire fraud counts and, in particular, his assertion that Jeffrey Grayson authorized him to make false expense reimbursement claims for his personal gain.

Nonetheless, the Court has considered Dean Kirkland's arguments about the general culture of indulgence at CCI, Jeffrey Grayson's alleged desire to motivate and to reward Dean Kirkland as a "super employee," and Jeffrey Grayson's admitted crimi-

---

6. If he purchased used shotguns, ATF would not have any records of such purchases.

nal conduct in connection with the collapse of CCI. Dean Kirkland argues these circumstances, at the very least, create some uncertainty as to whether Jeffrey Grayson did or did not authorize Dean Kirkland's false expense submissions. Having considered all of the evidence on this issue, the Court rejects this argument and finds the following additional facts beyond a reasonable doubt:

Jeffrey Grayson was a sophisticated businessman and financier. When Jeffrey Grayson wanted to reward, to motivate, and to compensate productive employees with "perks," he found legitimate ways to do so. For example, Jeffrey Grayson allowed Linda Lucas, a CCI manager, to use a Mercedes as her company car. Jeffrey Grayson also allowed Hal Porter to use CCI's membership at a prestigious Oregon country club. In each instance, CCI would be able to treat these "perks" as business expenses. Although Jeffrey Grayson may have been willing to use false "client raffle" entries to describe potentially questionable client expenses, he obviously did not need a subterfuge to reward Dean Kirkland and to take advantage of tax benefits at the same time.

In short, there is not any credible explanation as to why Jeffrey Grayson would endorse a scheme to use false expense entries so that Dean Kirkland could obtain money or property for his personal benefit over and above his already generous compensation package. There is, however, overwhelming and uncontradicted evidence that Dean Kirkland knowingly submitted the false expense statements that underlie the wire fraud counts for his personal gain. In any event, when Dean Kirkland learned a receiver was about to close down CCI, he instructed Shelly Connover to remove his expense reports from CCI's office because they were "nobody's business." This statement speaks volumes about Dean Kirkland's true intent when he routinely submitted false expense reimbursement claims.

Having considered all of the evidence on these elements, the Court finds beyond a reasonable doubt that Dean Kirkland intended to defraud CCI for his personal gain when he submitted each of the false expense reimbursement statements underlying each of the wire fraud counts. Accordingly, the Court finds beyond a reasonable doubt that the government has proved the "intent to defraud" requirement of Elements 1 and 4 of each wire fraud count.

## IV. *Element 5: Use of Interstate Wires.*

■ Finally, as to each wire fraud count, the government also must prove beyond a reasonable doubt that Dean Kirkland used interstate wires to carry out an essential part of the scheme to defraud. The government relies on alternative factual premises.

As to Counts 42, 43, 44, 45, 46, 47, 52, and 53, the government points to Dean Kirkland's use of a VISA card at the point of each purchase, which, according to the government, generated an interstate wire transmission that produced an authorization code necessary to complete each transaction. Dean Kirkland does not dispute the government's evidence that an interstate wire transmission occurred in connection with each of the authorized credit card transactions underlying these counts.

As to Counts 48, 49, 51, and 54, the government notes Dean Kirkland used the CCI reimbursement checks underlying each of these counts as a credit on his VISA account. The government alleges an interstate wire transmission occurred each time Dean Kirkland's bank processed such a credit to Dean Kirkland's VISA account. Again, Dean Kirkland does not dispute the government's evidence that an interstate

wire transmission occurred each time the bank processed such a credit.

According to Dean Kirkland, however, each wire transmission that occurred in connection with each of these counts was merely incidental to and not an "essential part" of any scheme to defraud. Put another way, Dean Kirkland contends the government must prove it was necessary to use interstate wires to carry out such a scheme. That, however, is not the law, and Dean Kirkland's reliance on *Ferguson v. Maita,* 162 F.Supp.2d 433 (W.D.N.C. 2000)(a civil racketeering case), and *United States v. Roach,* 296 F.3d 565 (7th Cir.2002)(a sentencing case) is misplaced. To violate the wire fraud statute, the "[wire] transmission need not be essential to the success of the scheme to defraud ... if the transmission is ... incident to an essential part of the scheme." *United States v. Hasson,* 333 F.3d 1264, 1273 (11th Cir.2003)(citing *Schmuck v. United States,* 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)). *See also United States v. Hubbard,* 96 F.3d 1223, 1228–29 (9th Cir.1996) (court construes mail fraud statute in a similar fashion).

Having considered all of the evidence on this issue, the Court finds beyond a reasonable doubt that the government has proved Dean Kirkland used interstate wires to carry out an essential part of the scheme to defraud that underlies each of the wire fraud counts. Accordingly, the Court finds beyond a reasonable doubt that the government has proved Element 5 of each of the wire fraud counts.

### V. *Verdicts on Wire Fraud Counts.*

Having weighed and evaluated all of the evidence, the Court finds the government has proved beyond a reasonable doubt all of the elements of each of the wire fraud counts. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirk-land is **GUILTY** of Counts 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, and 54.

## OBSTRUCTION OF JUSTICE: COUNT 55 AGAINST DEAN KIRKLAND

### I. *The Law*

18 U.S.C. § 1503(a) provides in pertinent part:

Whoever, corruptly ... endeavors to influence ... or impede any grand or petit juror, or officer in or of any court of the United States, ... or corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subparagraph (b).

 To convict a defendant of obstruction of justice, the government must prove the defendant did an act intended to obstruct justice. *United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir.1981). The destruction or concealment of subpoenaed documents constitutes obstruction of justice in violation of 18 U.S.C. § 1503. *Id.* A defendant who lies to an FBI agent when the defendant knows the agent is acting as an arm of the grand jury by serving a grand jury subpoena is subject to liability for obstruction of justice under § 1503. *United States v. Hopper,* 177 F.3d 824, 830 (9th Cir.1999) (citing *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995)). *See also United States v. Plascencia–Orozco,* 768 F.2d 1074 (9th Cir.1985)(giving a false identity to a federal magistrate, thereby preventing the magistrate from gathering facts necessary to sentence a defendant, constitutes obstruction of justice under § 1503).

To establish obstruction of justice as charged against Dean Kirkland in Count 55, therefore, the government must prove beyond a reasonable doubt the following elements:

1. On or about September and October 2000, a federal grand jury impaneled in the District of Oregon was conducting an inquiry into alleged violations of federal law by CCI, related entities, and/or individuals;

2. Dean Kirkland knew the grand jury proceeding was taking place; and

3. Dean Kirkland acted or endeavored to act corruptly with the intent to obstruct or to impede the grand jury proceeding

 a. by destroying documents he knew were material to the investigation in late September 2000, and/or

 b. by lying to federal agents when he falsely claimed on October 20, 2000, that he previously gave all of his CCI documents back to CCI.

## II. Element 1.

Having considered all of the evidence pertinent to this element, the Court finds beyond a reasonable doubt that a federal grand jury was impaneled in the District of Oregon beginning in April 2000 and continuing through September and October 2000 and beyond to investigate alleged violations of federal law by CCI, "related entities" such as Wilshire and Sterling,[7] and/or individuals. The Court, therefore, finds beyond a reasonable doubt that the government has established Element 1 of the obstruction count.

## III. Elements 2 and 3.

Because the government has two different factual premises on which it predicates the obstruction count, the Court considers the sufficiency of the evidence for Elements 2 and 3 separately for each premise.

## A. Premise A: Destruction of CCI Office Documents in Late September 2000.

■ 1. *Element 2.* To meet its burden with respect to Element 2 under this factual premise, the government first points to two newspaper articles published in *The Oregonian* that disclosed a federal grand jury was investigating Wilshire and its dealings with CCI. In his direct testimony, Dean Kirkland admitted he read the first article dated April 30, 2000, near the time it was published. Dean Kirkland also admitted he read the second article dated September 3, 2000, which reported *The Oregonian's* own investigation of CCI's gifts of hunting and fishing trips to union trustees. This article was titled "Investment Firm's Gifts to Trustees Questioned," emphasized Dean Kirkland's role as "host and chief organizer" of the trips, and referred to the "larger investigation" in which the Grand Jury was "delving into [Jeffrey] Grayson's placement of union funds in the ill-fated former Wilshire Credit Corp."

In addition, the government relies on the testimony of Milo Petranovich, a lawyer representing CCI who met with Dean Kirkland before and after the September 3, 2000, newspaper article. The Court finds Petranovich's testimony was credible. Based on Petranovich's testimony, the Court finds the following additional facts beyond a reasonable doubt:

---

7. CCI loaned at least $160 million of union trust funds for a collateralized note program managed by Wilshire Credit Corporation and Wilshire Financial Services Group. Wilshire filed for bankruptcy protection in 1999. CCI then arranged for Sterling Capital, LLC, to assume Wilshire's liability to repay these loans. Sterling, however, was a shell company with no assets. After the conclusion of trial in this matter, and pursuant to a Plea Agreement dated June 3, 2004, Andrew Wiederhorn, a chief executive of Wilshire Financial Services Group and Wilshire Credit Corporation, pled guilty to Unlawful Payment of a Gratuity in violation of 18 U.S.C. § 1954 and Making and Subscribing to a False U.S. Individual Tax Return in violation of 26 U.S.C. § 7206(1).

In summer 2000, Petranovich was representing CCI in an ongoing SEC investigation and learned SEC investigators wanted to interview Dean Kirkland. Petranovich first met with Dean Kirkland in late August 2000 to determine whether Petranovich also could represent Dean Kirkland as a CCI employee in the SEC investigation. There was not any discussion in that meeting about a grand jury investigation.

After this first meeting, Petranovich learned the SEC investigators were focusing on "potential criminal aspects" of hunting and fishing trips Dean Kirkland hosted for union trustees. Petranovich met again with Dean Kirkland shortly after Labor Day, which was September 4, 2000. At this meeting, Petranovich told Dean Kirkland that SEC investigators were making "serious criminal allegations" about Dean Kirkland and the hunting and fishing trips, and it was necessary for him to retain "separate counsel and a criminal defense lawyer." There still was not any discussion about a grand jury investigation.

Petranovich's testimony proves Dean Kirkland knew the SEC was investigating CCI and was making allegations about possible criminal misconduct on the part of Dean Kirkland, but it does not show Dean Kirkland knew anything about the Grand Jury proceedings. The Court, therefore, finds Petranovich's testimony is not a factor as to Element 2 under this factual premise.

Having considered all of the evidence pertinent to Element 2 in the context of Premise A, the Court finds beyond a reasonable doubt that Dean Kirkland read the first newspaper article around April 2000 and read the second newspaper article in early September 2000. As to Element 2 under this premise, the Court, therefore, finds the government proved beyond a reasonable doubt that Dean Kirkland became aware around April 2000 that the Grand Jury was investigating CCI and its rela-

tionship with Wilshire, and he was aware in early September 2000 that the Grand Jury investigation was still continuing.

2. *Element 3a.* The government did not offer any explicit evidence about the scope of the Grand Jury investigation in September and October 2000. Although it follows that Dean Kirkland knew at this time that the Grand Jury would be interested in documents concerning CCI and Wilshire, the government did not prove Dean Kirkland ever had possession of any such CCI documents during this period or that Dean Kirkland was aware which documents might be material to the Grand Jury investigation. In addition, despite the fact that the Court finds, as detailed below, Dean Kirkland destroyed CCI "office documents" in late September 2000, the government did not prove he destroyed documents concerning Wilshire's dealings with CCI or any other documents material to the Grand Jury investigation at that time. Thus, the government did not prove Dean Kirkland "acted or endeavored to act corruptly with the intent to obstruct or to impede the grand jury proceeding" with respect to the destruction of documents as required by Element 3a of this premise.

Accordingly, the Court finds the government has not proved beyond a reasonable doubt that Dean Kirkland obstructed justice under the "destruction of CCI office documents" premise of Element 3a.

## B. *Premise B: Lying to Federal Agents on October 20, 2000.*

1. *Element 2.* The Court incorporates its analysis and findings with respect to Element 2, Premise A, that Dean Kirkland became aware around April 2000 that the Grand Jury was investigating CCI and its relationship with Wilshire, and he was aware in early September 2000 that the Grand Jury investigation was still continu-

ing. In addition, the Court finds credible the testimony of FBI Agent Joseph LaMonica, which establishes the following additional facts beyond a reasonable doubt:

On October 20, 2000, at Dean Kirkland's residence in Camas, Washington, Agent LaMonica and another agent served Dean Kirkland with a "Subpoena to Testify Before Grand Jury." The Subpoena required Dean Kirkland to appear before the Grand Jury on November 7, 2000. The Subpoena also stated:

> YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):
>
> Provide any and all records in any form relating to Capital Consultants and/or related parties, entities, or clients, including but not limited to any records removed from the premises of Capital Consultants.

As of October 20, 2000, therefore, the Court finds beyond a reasonable doubt that Dean Kirkland knew the Grand Jury wanted him to appear before it and to produce any and all documents that were within the scope of the Subpoena. Accordingly, the Court finds the government has met its burden with respect to Element 2 under this factual premise.

■ 2. *Element 3b.* As noted, the government also must prove Element 3b beyond a reasonable doubt; *i.e.*, that Dean Kirkland "acted or endeavored to act corruptly with the intent to obstruct or to impede the grand jury proceeding ... by lying to federal agents when he falsely claimed on October 20, 2000, that he previously gave all of his CCI documents back to CCI." Based on Agent LaMonica's testimony, the Court also finds beyond a reasonable doubt that, in response to receiving the Subpoena, Dean Kirkland told Agent LaMonica on October 20, 2000, he "did not have any Capital Consultants records at the residence" and he "had turned over any records" that he had to CCI or to Shelly Connover. The government contends Dean Kirkland lied when he made these statements because, according to the government, Dean Kirkland destroyed CCI "office documents" on or about September 21, 2000.[8]

Having considered all of the evidence with respect to Dean Kirkland's possession of CCI documents at his home office generally, the Court finds the following additional facts beyond a reasonable doubt:

Dean Kirkland worked for CCI as a full-time salesman from at least 1995 until CCI went into receivership on September 21, 2000. Although Dean Kirkland had an office at CCI's Portland place of business, he frequently worked out of his home office in Camas, Washington, when he was not "on the road." When Dean Kirkland was working at home, Shelly Connover faxed him client correspondence and sent him "presentation books" by Federal Express, sometimes daily. Clients such as John Lontine, a Denver-based trustee, also mailed correspondence to Dean Kirkland at his home office. In fact, Dean Kirkland regularly invited clients and various outfitters for CCI-funded hunting and fishing

---

8. In response to Dean Kirkland's Rule 29 Motions at the end of the government's case-in-chief, the prosecutors also argued Dean Kirkland's October 20, 2000, statements to federal agents were false because Dean Kirkland, in fact, had CCI documents in his possession at that time. The government, however, did not offer any evidence during its case-in-chief from which a trier-of-fact could find Dean Kirkland actually possessed CCI documents on October 20, 2000. The Court, therefore, granted Dean Kirkland's Rule 29 Motion on this aspect of the obstruction-of-justice count. Nonetheless, during the presentation of his case, Dean Kirkland admitted he had copies of his 1994–2000 expense reimbursement records in his possession on October 20, 2000. The evidence, however, came too late and, therefore, is irrelevant for purposes of this analysis.

trips to correspond with him at his home office, and they did. Sometimes Dean Kirkland also took documents from the CCI office and did not return them.

Although these facts strongly suggest Dean Kirkland must have had CCI office documents at his home office in late September 2000, the only explicit evidence that shows Dean Kirkland possessed and destroyed any such documents at that time was the testimony of Barclay Grayson.[9] Although Dean Kirkland and Gary Kirkland insist the Court should not believe Barclay Grayson because of his felony conviction for mail fraud and his ongoing obligations to this Court on supervised release, the Court, nonetheless, finds Barclay Grayson's testimony was credible throughout these proceedings. Having carefully weighed and considered Barclay Grayson's testimony, the Court finds the following additional facts beyond a reasonable doubt:

Shortly after the Receiver took over the operations of CCI on September 21, 2000, Barclay Grayson telephoned Dean Kirkland, who was at home. Dean Kirkland told Barclay Grayson that he was "outside having a cigar, a cognac, and having a bonfire." When Barclay Grayson asked Dean Kirkland what he was burning, he answered, "Office documents."

Later, after federal agents served Dean Kirkland with the Grand Jury Subpoena on October 20, 2000, Barclay Grayson and Dean Kirkland had another telephone conversation. Dean Kirkland laughed and told Barclay Grayson that two federal agents had come to Dean Kirkland's residence, and he had "invited them to look at anything and everything that they wanted to. And it didn't really matter, because . . . the documents were gone."

In response to Barclay Grayson's testimony, Dean Kirkland conceded during direct examination that he made "those statements" to Barclay Grayson about burning documents. Dean Kirkland suggested, however, that, after "wracking . . . [his] brain," he must have been referring to burning CCI brochures, which he frequently used as "fire starters" for the wood-burning stove in his home office. In any event, Dean Kirkland explicitly denied he burned any CCI "office documents." The Court, however, does not find this testimony credible. Dean Kirkland's term "bonfire" and his apparently celebratory behavior in smoking a cigar and drinking cognac do not fit the scenario of merely burning brochures that he ordinarily used as "fire starters" in his wood stove. Moreover, if brochures were the only documents Dean Kirkland burned, it does not follow that Dean Kirkland would happily tell Barclay Grayson "it didn't really matter" whether the agents looked for CCI office documents because they were "gone."

Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland burned CCI "office documents" other than sales brochures shortly after the Receiver took over CCI on September 20, 2000.

As noted, the government also claims Dean Kirkland lied to federal agents on October 20, 2000, when he told them that he "did not have any Capital Consultants records at the residence" and that he "had turned over any records" he had either to CCI or to Shelly Connover. Having considered all of the evidence on this issue, the Court finds the following additional facts beyond a reasonable doubt:

Late at night on September 20, 2000, Dean Kirkland telephoned Connover at

---

**9.** Pursuant to his Plea Agreement with the government on March 19, 2001, Barclay Grayson pled guilty to the felony crime of Mail Fraud in violation of 18 U.S.C. § 1341, agreed to cooperate with the government in its ongoing criminal investigations, and, pursuant to his agreement to cooperate, testified in this trial.

home, told her CCI was closing down the next day, and directed her to meet him at a local bar. When Connover arrived at the bar early on September 21, Dean Kirkland told her that CCI was closing because it allegedly was involved in "a Ponzi scheme." As noted, Dean Kirkland also asked Connover to go to the CCI office to retrieve his "expense reports" because they were "nobody's business." Connover complied.

Connover went to work that morning and was in the process of gathering Dean Kirkland's expense reports from the accounting office when a manager stopped her. She placed some of Dean Kirkland's personal property in a box along with those expense reports she had collected already and took the box home. Within a few days or a week, Connover gave the box containing the expense reports to Dean Kirkland.

In late September or early October 2000, the Receiver for CCI spoke to Connie Kristensen, Portfolio Manager for the Receiver, about locating Dean Kirkland's original expense reports for the year 2000. Kristensen telephoned Dean Kirkland, and he told her that he did not have these reports. After Kristensen spoke with Connover, however, Kristensen called Dean Kirkland back, told him that Connover said the reports were in the box, and asked him to look for them again. Dean Kirkland called Kristensen back, said he found the reports in the box, and arranged to return them to CCI. After the reports were returned, Kristensen telephoned Dean Kirkland again and told him he was "square" with the Receiver.

Although the Court finds Dean Kirkland returned his original expense records for the year 2000 to the Receiver in late September or early October 2000, the Court, nonetheless, also finds beyond a reasonable doubt that Dean Kirkland lied to federal agents on October 20, 2000, when he

said he "had turned over any records" either to CCI or to Connover because, in fact, Dean Kirkland had burned and destroyed other CCI "office documents" shortly after September 20, 2000.

■ Finally, to meet its burden as to Element 3b of the obstruction-of-justice count, the government also must prove beyond a reasonable doubt that Dean Kirkland intended to obstruct the Grand Jury investigation when he lied to federal agents on October 20, 2000.

Having considered all of the evidence on this issue, the Court finds the following additional facts beyond a reasonable doubt:

When Dean Kirkland lied to federal agents on October 20, 2000, he had just been served with the Grand Jury Subpoena that required him to produce "any and all records in any form relating to Capital Consultants and/or related parties, entities, or clients." Dean Kirkland knew at the time that the Subpoena called for him to produce such documents to the Grand Jury. Dean Kirkland also knew he did not have any obligation to make any statements and the agents were not seeking to interview him or to search the premises. Nonetheless, Dean Kirkland knowingly volunteered the false statement that he "had turned over any records" he had to CCI or to Connover. In addition, Dean Kirkland invited the agents to his office and suggested they search for that which he knew was already "gone." While in his home office, Dean Kirkland drew the agents' attention to the obviously harmless brochures, emphasized he used these as "fire starters" for his wood stove, and asked whether these might be responsive to the Subpoena as if he had an earnest desire to cooperate.

The Court, however, finds Dean Kirkland knowingly engaged in a charade for the purpose of appearing to cooperate with the agents and, by extension, with the Grand Jury when, in fact, he had already

lied about returning "any" CCI office documents. It follows, therefore, that Dean Kirkland intended to misdirect the agents and the Grand Jury. Thus, the Court finds beyond a reasonable doubt that the government proved Dean Kirkland "acted or endeavored to act corruptly with the intent to obstruct or to impede the grand jury proceeding" by lying to federal agents when he falsely claimed on October 20, 2000, that he previously gave all CCI office documents in his possession to CCI or Connover.

## IV. *Verdict on Obstruction–of–Justice Count.*

Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of obstruction of justice. The Court, therefore, finds beyond a reasonable doubt that Dean Kirkland is GUILTY of obstruction of justice for lying to federal agents on October 20, 2000, as charged in Count 55.

## GRATUITIES: COUNTS 1–41 AGAINST ALL DEFENDANTS

### I. *The Law*

18 U.S.C. § 1954 provides:

Whoever being -

(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or

\* \* \* \* \* \*

(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan;

\* \* \* \* \* \*

receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of . . . any of the actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both: *Provided,* That this section shall not prohibit the payment to or acceptance by any person of bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of his duties as such person, administrator, officer, trustee, custodian, counsel, agent, or employee of such plan, employer, employee organization, or organization providing benefit plan services to such plan.

(Emphasis in original.)

██ To establish a violation of 18 U.S.C. § 1954, the government must prove beyond a reasonable doubt that a motivational link or nexus exists between a thing of value conferred on a trustee and a specific action, decision, or duty [10] of the trus-

---

**10.** Throughout the trial, the government made generic arguments about the meaning of "other duties" within the context of § 1954 and maintained the Court should consider each of the gratuities counts under that rubric in the event the Court finds the government did not prove the requisite link between a charged gratuity and a trustee's particular "action" or "decision." The Court has been unable to define the meaning of "other duties" under the factual circumstances of

this case. In particular, the government did not charge, and, therefore, the Court has no basis to adjudicate, whether any particular trustee breached any particular fiduciary duty in connection with CCI-related matters. The Court, therefore, limits its consideration of the gratuities counts to determining whether the government proved a link between each charged gratuity and a particular action or decision of the trustee-recipient.

tee who receives the thing of value. *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398, 414, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999)(the government "must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given" to establish a violation of 18 U.S.C. § 201(c)(1)(A)).

The government, however, need not prove a defendant knew the giving of a gratuity or the receiving of a gratuity was prohibited by law. The government must prove only that a defendant gave or received a gratuity "because of" actions or decisions of the trustee-recipient. *United States v. Soares*, 998 F.2d 671 (9th Cir. 1993).

## II. Gratuities: Counts 1–21 [11] Against Dean Kirkland

As to each of the remaining gratuities counts charged against Dean Kirkland in the Second Superseding Indictment, the government must prove beyond a reasonable doubt the following elements:

1. As alleged in each count, Dean Kirkland gave a thing of value on or about the dates alleged to one or more persons who were trustees of one or more plans subject to 18 U.S.C. § 1954;

2. The trustee-recipient, in fact, received the thing of value as alleged in each count; and

3. Dean Kirkland gave each thing of value because of one or more of the trustee-recipient's specific actions or decisions.

### A. Elements 1 and 2.

In general, Dean Kirkland concedes Elements 1 and 2 for each of the remaining gratuities counts against him.

Thus, the Court need not summarize the overwhelming and essentially uncontradicted evidence that establishes Dean Kirkland gave, and each of the identified trustees received, the various gratuities as alleged. Although CCI ultimately funded each of the remaining gratuities charged against Dean Kirkland, it is undisputed that Dean Kirkland personally decided to give each of them and personally determined the trustees who would receive them. The Court, therefore, finds Dean Kirkland "gave" each gratuity as a principal and not as an aider or abettor of criminal conduct by CCI pursuant to 18 U.S.C. § 2. In any event, the Court has considered all of the evidence and finds the following facts pertinent to Elements 1 and 2 beyond a reasonable doubt:

Count 1: In September 1997, Dean Kirkland gave to Robert Legino a hunting trip in Alaska and related expenses. When Robert Legino received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 2: In November 1997, Dean Kirkland gave to Robert Legino a hunting trip to Oxbow Ranch (Oregon) and related expenses. When Robert Legino received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 3: In February and October 1998, Dean Kirkland caused to be paid on behalf of Gary Kirkland legal fees and fines that arose from the 1997 Oxbow Ranch hunting trip. When

11. At the close of the government's case-in-chief, the Court granted Dean Kirkland's Rule 29 Motion as to Count 6 and granted Dean Kirkland's Rule 29 Motion as to Counts 1, 2, 8, and 10 to the extent these Counts charged Dean Kirkland with giving an illegal gratuity to Gary Kirkland.

these things of value were paid on Gary Kirkland's behalf, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 4: In April 1998, Dean Kirkland gave to John Lontine Denver Bronco season tickets.[12] When John Lontine received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 5: In May 1998, Dean Kirkland gave to Robert Legino a Sako rifle. When Robert Legino received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 7: In July 1998, Dean Kirkland gave to John Lontine a fishing trip in Alaska. When John Lontine received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 8: In August 1998, Dean Kirkland gave to Robert Legino a hunting trip in Africa and related expenses. When Robert Legino received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 9: In September 1998, Dean Kirkland gave to Dennis Talbott, a trustee of Local 33 based in Akron, Ohio, a hunting trip to Clover Creek Ranch in Oregon. When Dennis Talbott received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 10: In November 1998, Dean Kirkland gave to Robert Legino; Blaine Newman, an Eighth District trustee; and Dennis Talbott a hunting trip to Hubbard's Yellowstone Lodge in Montana and related expenses. When Robert Legino, Blaine Newman, and Dennis Talbott each received these things of value, each was a trustee of one or more plans · described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 11: In March 1999, Dean Kirkland gave to John Lontine Denver Bronco season tickets.[13] When John Lontine received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 12: In July 1999, Dean Kirkland gave to Gary Kirkland a fishing trip to Tsuniah Lake Lodge in British Columbia, Canada, and related expenses. When Gary Kirkland received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 13: In September 1999, Dean Kirkland gave to Gary Kirkland a hunting trip in Montana and re-

12. Having considered all of the evidence, the Court rejects Dean Kirkland's argument that he gave this gratuity to John Lontine for the benefit of his fellow union members rather than to John Lontine personally.

13. Again, the Court rejects Dean Kirkland's argument that he gave this gratuity to John Lontine for the benefit of his fellow union members rather than to John Lontine personally.

lated expenses. When Gary Kirkland received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 14: In November 1999, Dean Kirkland gave to Robert Legino, Gary Kirkland, Robert Mayhew, and Dennis Talbott a hunting trip to The Lodge at Chama in New Mexico and related expenses. When Robert Legino, Gary Kirkland, Robert Mayhew, and Dennis Talbott each received these things of value, each was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 15: In December 1999, Dean Kirkland gave to John Lontine Colorado Rockies tickets. When John Lontine received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 16: In December 1999, Dean Kirkland gave to Gary Kirkland a hunting trip in Mexico and related expenses. When Gary Kirkland received these things of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 17: In January 2000, Dean Kirkland gave to Robert Legino a Weatherby rifle. When Robert Legino received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 18: In January 2000, Dean Kirkland gave to Robert Mayhew a Weatherby rifle. When Robert Mayhew re-ceived this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 19: In March 2000, Dean Kirkland gave to Robert Legino and Gary Kirkland a hunting trip in Argentina and related expenses. When Robert Legino and Gary Kirkland each received theses things of value, each was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 20: In May 2000, Dean Kirkland gave to Gary Kirkland a fishing trip in Alaska and related expenses. When Gary Kirkland received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Count 21: In September 2000, Dean Kirkland gave to Gary Kirkland a hunting trip in Alaska and related expenses. When Gary Kirkland received this thing of value, he was a trustee of one or more plans described in 18 U.S.C. § 1954 as alleged in the Second Superseding Indictment.

Having considered all of the evidence, the Court finds beyond a reasonable doubt that the government has proved Elements 1 and 2 of each of the remaining gratuities counts against Dean Kirkland.

**B.** *Element 3: "Because of" a Trustee's Actions or Decisions.*

1. *Definition.*

■ As noted, for each § 1954 count against Dean Kirkland, the government also must prove beyond a reasonable doubt

that Dean Kirkland gave each thing of value "because of" one or more of the trustee-recipient's actions or decisions "relating to any question or matter" concerning the trustee's particular plans. In particular, to comply with *Sun–Diamond,* the government must prove a motivational link between the thing of value that Dean Kirkland gave to a trustee and the trustee's specific action or decision "for or because of which it was given." Under *Sun–Diamond,* it is not enough if Dean Kirkland was motivated merely by a trustee's general capacity to decide matters that affected Dean Kirkland's business interests or if Dean Kirkland was seeking merely to build "a reservoir of goodwill." *See* 119 S.Ct. at 1406. Under *Sun–Diamond,* it is enough, however, if the government proves beyond a reasonable doubt that Dean Kirkland gave the thing of value "because of" a trustee's specific actions or decisions that Dean Kirkland anticipated or "because of" a trustee's specific past actions or decisions that Dean Kirkland intended to reward. *See id.*

■ The Court, however, has been unable to find any authority that defines the meaning of the words "because of" in the context of 18 U.S.C. § 1954, including the statute itself. When a statute does not define words contained within its text, courts will give the words their ordinary meaning. *Bailey v. United States,* 516 U.S. 137, 144–45, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (citations omitted). The ordinary meaning of words can be determined from dictionaries. *United States v. Mohrbacher,* 182 F.3d 1041, 1048 (9th Cir.1999) (citing *Muscarello v. United States,* 524 U.S. 125, 128–31, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998)). In *Merriam–Webster's Collegiate Dictionary* 108 (11th ed.2003), "because of" is defined as "by reason of" or "on account of."

Applying these ordinary meanings to the context of § 1954, the Court rejects Defendants' collective arguments that the Court should apply a "but for" causation standard or at least a standard that would require the government to prove that a trustee's actions or decisions were "the *primary* factor" in the giver's motivation to give or the recipient's motivation to receive the thing of value. Similarly, the Court rejects the government's argument that it need only prove a trustee's actions or decisions were "a" motivational factor, however slight, in the giver's motivation to give or the trustee-recipient's motivation to accept the thing of value. The statutory context does not suggest Congress intended either of these restrictive interpretations. Giving the words "because of" their ordinary meaning in the context of the gratuities counts against Dean Kirkland, and in light of *Sun–Diamond,* the Court concludes the government must prove beyond a reasonable doubt as to each count that a substantial factor in Dean Kirkland's motivation to give the thing of value was the trustee's specific past or anticipated actions or decisions. A "substantial factor" is an important or material factor and not one that is insignificant. *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1112, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Thus, the government need not prove this was the only or the primary factor in Dean Kirkland's motivation to give the thing of value.

### 2. *General Findings.*

The parties offered considerable evidence concerning Dean Kirkland's state of mind when he gave hunting and fishing trips and various other things of value to Gary Kirkland, Robert Legino, and/or other client trustees. Some of the evidence reflects Dean Kirkland's own words on the subject. Other evidence suggests Dean Kirkland's motivations varied as to different trustee-recipients and changed over time as his own income and certain trust

investments with CCI grew significantly and as the trips became more lavish and frequent.

Having considered all of the evidence pertinent to Element 3, and after carefully reviewing the record and the parties' positions on the issue of Dean Kirkland's motivations for giving each of the gratuities charged in the remaining counts against him, the Court finds the following additional facts beyond a reasonable doubt:

Dean Kirkland began his full-time work as a salesman for CCI at the end of his professional football career in 1995. When Dean Kirkland came to CCI, he already had life experience with union trustees because his father, Gary Kirkland, was a long-time leader in and trustee for Portland unions. Dean Kirkland also had many potentially useful relationships arising from his college football years at the University of Washington. Dean Kirkland recognized early the value of these existing relationships to his future success in sales. In fact, when Dean Kirkland was still a part-time employee at CCI, his 1992 Employment Agreement contained a noncompete clause that excepted these kinds of relationships from its scope.

Jeffrey Grayson became Dean Kirkland's mentor at CCI, and Dean Kirkland learned quickly that making inroads into the "Taft–Hartley"[14] market would require him to develop personal relationships with the trustees who made the decisions to place union trust funds with investment managers like CCI. Dean Kirkland worked hard to build friendly relationships with union trustees outside of the Portland area. He traveled extensively, paid many "cold calls" on potential clients, and had daily contact with a wide network of existing clients and future prospects. As any good salesman would, Dean Kirkland parlayed his football career and genuine interest in hunting and fishing into points of common interest with numerous trustees.

In particular, older trustees like Robert Legino, John "Swede" Swanson, and Clark Knauss found Dean Kirkland appealing, and he quickly formed close, personal relationships with each of them at the same time as the trusts on which they served did business with CCI. Within six months of meeting Robert Legino, for example, Dean Kirkland viewed Legino as a "second grandfather," and Legino thought of Dean Kirkland as the son he never had. Swanson and Knauss also each thought of themselves as a "second father" to Dean Kirkland. As time passed, Dean Kirkland shared with each of these trustees a great deal of personal information, including details about the difficult relationship he had with his father, Gary Kirkland.

Long before Dean Kirkland began his sales career at CCI, it was standard in the industry for fund investment managers and others to entertain union trustees in various ways as a means to build and to maintain business relationships. For example, fund managers might host hospitality suites at annual meetings, take trustees to dinner or to a professional sporting event, or pay a trustee's way for a round of golf or other athletic activities. CCI was no different. Indeed, Jeffrey Grayson taught Dean Kirkland that one had to "spend money to make money," and this motto became Dean Kirkland's mantra.

To that end, Jeffrey Grayson gave Dean Kirkland a generous expense account and allowed him to spend money "like candy" for purposes of marketing CCI's services and entertaining trustee clients and poten-

---

14. A Taft–Hartley plan is an employee welfare or pension benefit plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq. ERISA provides protection to participants of employee welfare benefit plans and employee pension benefit plans.

tial clients. Although others within CCI often questioned the amounts of Dean Kirkland's expenses, Jeffrey Grayson set no particular limit on the money Dean Kirkland could spend as long as CCI could "write off" the cost as a business expense. Jeffrey Grayson authorized Dean Kirkland to incur extraordinarily large expenses to entertain clients when there was a basis to believe the expenses ultimately would be "cost-effective."

As previously noted, Jeffrey Grayson also used legitimate "perks" as a way to motivate and to compensate productive employees. Dean Kirkland, however, was not interested in a country club membership or playing golf with clients. Instead Dean Kirkland had an avid, lifelong interest in hunting and fishing, and he wanted to take hunting and fishing trips at CCI's expense. Jeffrey Grayson agreed CCI would fund such trips involving one or more clients on the basis that CCI could "write off" the expenses.

The first hunting trip that CCI funded for Dean Kirkland occurred in November 1995 when he took Gary Kirkland to Oxbow Ranch. There were at least five other CCI-funded trips before Dean Kirkland took the September 1997 Alaska hunting trip that underlies the charges against him in Count 1: In August 1996, Dean Kirkland took Robert Legino fishing in Sitka, Alaska, and he took Legino and Gary Kirkland hunting at Oxbow Ranch in October of that year. In 1997, Dean Kirkland took Gary Kirkland on a hunting trip in February, took Robert Legino hunting in

Alaska in May, and took Gary Kirkland fishing in Alaska in June.[15]

Jeffrey Grayson did not authorize Dean Kirkland to take hunting and fishing trips at CCI's expense merely to enjoy himself with friends and family who were not clients or to spend time with his father, Gary Kirkland.[16] In fact, when CCI reimbursed Dean Kirkland or paid for hunting and fishing trips that Gary Kirkland went on, it was because Jeffrey Grayson viewed Gary Kirkland and the trusts on which he served as clients. Similarly, Jeffrey Grayson permitted Larry Kirkland, the twin brother of Gary Kirkland, to go on such outings at CCI's expense even though Larry Kirkland was not a client because this would keep Gary Kirkland, CCI's client, "happy." In any event, the Court finds credible Barclay Grayson's testimony that CCI's purpose in authorizing hunting and fishing trips hosted by Dean Kirkland was "to entertain clients, to bring in new money, and to preserve existing dollars."

When Dean Kirkland spent CCI money to entertain clients on hunting and fishing trips, he targeted the business managers and chairmen of the trusts because they typically controlled the dollars available for management by CCI. In addition, Dean Kirkland knew Jeffrey Grayson would not continue to approve the hunting and fishing trips unless they proved to be cost-effective; that is, unless the trustees who Dean Kirkland took on trips ultimately voted to invest, to increase, or to maintain their investments with CCI. Thus, Dean Kirkland typically did not ask trustees

---

15. As an aid to tracking these charged and uncharged trips in relation to the various actions and decisions of trustees "because of" which Dean Kirkland allegedly gave the charged gratuities, the Court prepared a chronological Timeline, which is attached as Exhibit A and incorporated herein as part of the Court's factual findings.

16. The Court does not find relevant the considerable hearsay testimony from Robert Legino, John Swanson, and Clark Knauss about Dean Kirkland's statements to them to the effect that Jeffrey Grayson authorized Dean Kirkland to take "anyone" on CCI-funded hunting and fishing trips. This hearsay evidence is not helpful to prove whether Jeffrey Grayson actually authorized the trips.

whose plans had small accounts with CCI to go on such trips.

Dean Kirkland's own statements and actions in 1998, 1999, and 2000 provide additional insight into his state of mind regarding his purposes in taking trustees on such trips or otherwise spending CCI money on trustees and his willingness to look to trustee-recipients for favors when he wanted them. Dean Kirkland's statements during this time also reflect both his awareness that questions were being raised about the propriety of the trips and his consistent efforts to squelch such questioning. For example:

- In July 1998, during an Alaska fishing trip, Dean Kirkland told John Lontine and other trustees that he was paying for the trip because this is how he "rewarded and took care of" his clients.

- In August 1998, Dean Kirkland sent an e-mail to Hal Porter in which Dean Kirkland expressed his intention "to tell my clients I would rather give out perks" [17] in ways other than cash political contributions.

- In September 1998, after Jeffrey Grayson pointed out to Dean Kirkland that the Oregon Laborers' Trust, CCI's largest client, was about to consider withdrawing funds from CCI's management, Dean Kirkland assured Grayson that he would invite Lee Clinton, the chairman of that trust, "on our hunting trips from here on out."

- In November 1998, CCI's accounting department questioned Dean Kirkland's use of airplane telephones to speak with clients. In an e-mail dated November 8, 1998, Dean Kirkland responded: "I know it's expensive, but the latest problem which is Wilshire

has kept me on the phone a lot more than usual. I'm always trying to raise new money, but it is equally as important to maintain the old!—actually more important."

- Later in November 1998, Legino and two other Eighth District trustees, Blaine Newman and Robert Mayhew, went hunting with Dean Kirkland at Hubbard's Yellowstone Lodge in Montana and did not attend the Eighth District's regularly scheduled trust meetings that took place in their absence. During the meetings, trustees from Salt Lake City made a motion to withdraw $10 million of the Eighth District's funds from CCI management because of growing concerns about Wilshire and its potential impact on the trusts' investments. The motion passed. Word of "trouble in the Eighth" quickly reached Dean Kirkland in Montana, and he irately complained to Legino that the other trustees had "taken" the $10 million "from me." Legino, in turn, immediately started making telephone calls from the Lodge, but he quickly realized there was little that could be done about the decision while they were away. Nonetheless, Legino assured Dean Kirkland he would look into the matter on his return.

- In December 1998, three weeks after a newspaper story reported the restructuring and "essential bankruptcy" of Wilshire, Dean Kirkland wrote an e-mail to Jeffrey Grayson in response to questions raised by CCI's accounting department regarding the legality of CCI paying taxidermy expenses for two stuffed pheasants that purportedly were donated to different local unions for "raffles." In his message, Dean

---

**17.** In this context, the Court finds Dean Kirkland was referring to, among other things, gifts of hunting and fishing trips.

Kirkland cautioned Jeffrey Grayson and CCI's accountant not to discuss "company expenses by e-mail anymore. Its [sic] just not private prudent [sic] in these highly volitale [sic] times."

- In January 1999, Matthew Frazer, a management trustee for the Eighth District plans, complained to Dean Kirkland about the ethics of his "behavior with trustees and with calling trustees outside" of trust meetings. Dean Kirkland responded he "was just trying to make a living." Frazer also questioned Dean Kirkland about rumors that he was taking trustees on trips because Frazer understood such gratuities were "against everything that ERISA lets you do as a trustee." Dean Kirkland responded he wasn't "doing anything in violation of ERISA, that they [the trustees who went on such trips] were just friends."

- In May 1999, Thomas Jagger, an attorney for the Eighth District plans, wrote an opinion directed to Eighth District trustees regarding the propriety of trustees receiving gratuities from investment managers and other service-providers. Jagger included with his opinion a questionnaire that he recommended each trustee complete by describing their past receipt of any such gratuities. In response, the trustees voted to pass guidelines that placed a $100 limit on the value of any gratuity an Eighth District trustee could accept. At the time, Robert Mayhew already was scheduled to go hunting with Dean Kirkland in November at The Lodge at Chama in New Mexico. Mayhew faxed a copy of Jagger's letter to Dean Kirkland because Mayhew knew the trip would exceed the new $100 limit. In a conversation with Mayhew shortly thereafter, Dean Kirkland told Mayhew not to worry because "it's all in my name, and nobody knows-nobody will know about it."

- In Spring 2000, the Local 9 pension plan failed to make some monthly payments to CCI for its management fees. Dean Kirkland telephoned John Lontine to seek his help in securing those payments. Initially, Lontine responded he would not be able to intervene because he was only one of six trustees. Dean Kirkland pressed Lontine further, however, and told Lontine he wanted "to call in a chit." Lontine understood this to mean that Dean Kirkland was asking for a favor.

- In September 2000, after the SEC commenced its investigation of CCI, and just before the Receiver took over CCI, several lawyers met with Jeffrey Grayson and Barclay Grayson at CCI's Portland office. During the meeting, it was disclosed that Dean Kirkland was about to go on another CCI-funded hunting trip with Gary Kirkland. By this time, Dean Kirkland already knew the SEC was raising "serious criminal allegations" about the legality of the trips. Jim Collins, one of the criminal defense attorneys at the meeting, told the Graysons the scheduled trip was "absolutely prohibited."[18] Barclay Grayson then tele-

18. Throughout the trial, the Court received evidence for limited purposes relating to the obstruction-of-justice count that Dean Kirkland purportedly obtained advice from various attorneys to the effect that the law did not prohibit Dean Kirkland and CCI from giving hunting and fishing trips to trustees as long as the trustees each paid their own way to and from a particular venue. To whatever extent this evidence might also be admissible for some purpose pertinent to the gratuities counts and not excluded by *United States v. Soares*, 998 F.2d 671 (9th Cir.1993), *cert. denied*, 510 U.S. 1094, 114 S.Ct. 927, 127 L.Ed.2d 220 (1994), the Court finds the evidence has little, if any, weight.

phoned Dean Kirkland and told him the trip was "prohibited" and "illegal." Dean Kirkland responded, "We'll just call it a family trip."

At least by 1998, therefore, Dean Kirkland had formulated and expressed a general intent to give hunting and fishing trips to trustees as a means of rewarding those clients who gave, maintained, or increased business with CCI. In addition, as scrutiny of Dean Kirkland's practices intensified, he attempted to justify the trips by saying they were for "family" or just "friends" and, in any event, that "nobody will know about it." At the same time, Dean Kirkland did not hesitate to go to trustees like Legino and Lontine who had accepted gratuities to ask for favors when he wanted them.

In the meantime, Dean Kirkland's compensation grew considerably, and he credited himself with taking CCI from local to national prominence and with quadrupling CCI's income. Indeed, in 1995, the first complete year Dean Kirkland worked as a full-time employee, he received approximately $141,000 in commission income above his base salary. By the end of his employment with CCI in 2000, Dean Kirkland was paid approximately $532,000 in commissions for the last 10 months he worked. In all, CCI paid Dean Kirkland approximately $2.4 million in commission income alone during his relatively short career at CCI.

3. *Count–Specific Findings and Verdicts.*

a. *Counts 4, 7, 11, and 15: Gratuities Given to John Lontine*

The Court finds the following additional facts beyond a reasonable doubt:

Dean Kirkland gave John Lontine, a trustee of the Denver-based Local 9 Sheet Metal Workers pension and health plans, the following charged gratuities: Denver Bronco season tickets in April 1998 (Count 4), Alaska fishing trip in July 1998 (Count 7), Denver Bronco season tickets in March 1999 (Count 11), and Colorado Rockies tickets in December 1999 (Count 15).[19]

In September 1997, John Lontine voted in favor of the Local 9 Health and Welfare Plan investing an additional $500,000 with CCI. Thereafter, in April 1998, Dean Kirkland gave Denver Bronco season tickets to Lontine. In July 1998, Dean Kirkland gave Lontine a fishing trip to Alaska. As noted, during this fishing trip, Dean Kirkland told Lontine and other trustees that CCI was paying for the trip because this is the way he "rewarded and took care of" his clients. After this trip, Dean Kirkland told Barclay Grayson that he would be requesting an additional $3 million in funds from Lontine's plan. Dean Kirkland did so, and, in September 1998, Lontine voted in favor of his plan investing an additional $3 million with CCI. Thereafter, at Lontine's request, Dean Kirkland arranged for CCI to pay for another round of Denver Bronco season tickets in March 1999. In December 1999, after a Colorado divorce court awarded these season tickets to Lontine's wife, Dean Kirkland gave Lontine season tickets for Colorado Rockies games

Having considered all of the evidence, and, in particular, Dean Kirkland's statements of intent to John Lontine and Barclay Grayson in the context of the timing between Dean Kirkland's giving of the gratuities to Lontine and Lontine's specific actions and decisions as a trustee, the

---

**19.** Pursuant to his Plea Agreement with the government on September 5, 2002, John Lontine pled guilty to the misdemeanor crime of Causing the Administrator of Certain Plans to Fail to Include Certain Transactions in an Annual Report in violation of 29 U.S.C. § 1131.

Court finds the government has established the requisite link and proved Element 3 for each of Counts 4, 7, 11, and 15 beyond a reasonable doubt as follows:

Dean Kirkland gave Lontine Denver Bronco tickets in April 1998 as a reward for and, thus, "because of" Lontine's September 1997 vote in favor of his union plans investing $500,000 with CCI. Dean Kirkland gave Lontine the Alaska fishing trip in July 1998 both as a reward for and, thus, "because of" Lontine's September 1997 vote and also in anticipation of and, thus, "because of" an expectation that Lontine would vote to have additional plan funds placed with CCI in September 1998. Dean Kirkland gave Lontine the second set of Denver Broncos tickets in March 1999 as a reward for and, thus, "because of" his actual vote in September 1998 in favor of his union investing an additional $3 million with CCI. Dean Kirkland gave Lontine the Colorado Rockies tickets in December 1999 to replace the Broncos tickets he lost in the divorce. Thus, Dean Kirkland gave those Rockies tickets to Lontine as a substitute reward for and "because of" Lontine's September 1998 vote.

*Verdicts.* Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Counts 4, 7, 11, and 15. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of each of these Counts.

b. *Counts 9, 10, and 14: Gratuities Given to Dennis Talbott*

The Court finds the following facts beyond a reasonable doubt:

██ Dennis Talbott was a trustee on two Sheet Metal Workers plans based in Akron, Ohio: Local 33 Sheet Metal Workers Pension Plan and Local 33 Tri–County Health and Welfare Plan. In early 1997,

Dean Kirkland paid a "cold call" on Talbott's boss, Allen Shermac, who introduced Dean Kirkland to Talbott. In their first conversation, Talbott and Dean Kirkland talked about their mutual interest in hunting. In July 1997, after Talbott's union made a $50,000 investment with CCI, Dean Kirkland invited Talbott to have dinner with him in Akron. Later, however, Dean Kirkland suggested Talbott and Chuck Bauman, the business agent for Talbott's union and a trustee of the pension plan, fly to Chicago in CCI's plane where Dean Kirkland took them and other clients to dinner.

In early 1998, Dean Kirkland invited Talbott to go hunting in November at Hubbard's Yellowstone Lodge in Montana. Shelly Connover sent Talbott various materials, including an application for a hunting license that Talbott completed in February. During this period, Talbott advocated to trustees of the pension plan to permit Dean Kirkland to make a sales presentation on behalf of CCI. To overcome resistance, Talbott telephoned various trustees, and, ultimately, Dean Kirkland went to Akron and made a sales presentation to both of the Local 33 plans. After this presentation, Talbott made a motion for the pension plan to invest $3.5 million with CCI. When the motion failed, Talbott made another motion for the plan to invest $1 million. That motion passed at a time when the plan was transitioning to a new investment consultant, and, therefore, there was some delay in the immediate funding of this investment. Talbott, however, followed through and continued to push for the actual funding of the investment with CCI, which ultimately occurred in July or August 1998. Earlier in April or May, the Local 33 health plan invested approximately $300,000 with CCI.

In mid-August 1998, shortly after the $1 million investment was funded, Dean Kirk-

land telephoned Talbott and invited him on the September 1998 hunting trip to Clover Creek Ranch in Oregon (Count 9). Dean Kirkland knew Talbott was in the midst of a divorce and would welcome the chance to get away. Talbott paid only for his airfare to Portland where Dean Kirkland picked him up and drove him in a motor home for the three-day hunting trip. In addition to Talbott and Dean Kirkland, Gary Kirkland, Larry Kirkland, another Kirkland relative, and two other clients from a longshoremen's union went on this trip.

In November 1998, Talbott went on the hunting trip to Hubbard's Yellowstone Lodge in Montana (Count 10) at CCI's expense. Robert Legino, Gary Kirkland, Blaine Newman, and Robert Mayhew also went on this trip.

In February 1999, the Local 33 health plan increased the percentage of its assets that could be invested with CCI. Talbott recommended and voted for this decision. About the same time, Dean Kirkland invited Talbott to go on another hunting trip planned for the following November to The Lodge at Chama in New Mexico. Again, Talbott completed an application and questionnaire in advance, which he sent to Shelly Connover.

In September 1999, Talbott made a motion for the pension plan to invest an additional $1 million with CCI. The motion did not pass.

In November 1999, Talbott went on the hunting trip to The Lodge at Chama in New Mexico (Count 14) at CCI's expense. Robert Mayhew, Robert Legino, Dean Kirkland, Gary Kirkland, Larry Kirkland, and two others also went on this trip. This was the last trip Talbott went on, and there is not any evidence of further investment by these plans with CCI.

With respect to Element 3 of Count 9, the Court notes Dean Kirkland's August 1998 invitation to Talbott to go on the Clover Creek Ranch trip came (a) shortly after the pension plan funded the $1 million investment that Talbott had advocated earlier in the year, (b) a few weeks after Dean Kirkland's statement to John Lontine that trips like this were how Dean Kirkland "rewarded and took care of" his clients, and © a few weeks before Dean Kirkland assured Jeffrey Grayson that Dean Kirkland would invite Lee Clinton, a trustee of CCI's largest client, "on all our hunting trips from here on out." In addition, with respect to Element 3 of Count 10, the Court finds it significant that Dean Kirkland's invitation to Talbott to go on the Hubbard's Yellowstone Lodge trip charged in Count 10 came at the same time that Talbott initially was advocating for the Local 33 pension plan's $1 million investment. Similarly, with respect to Element 3 as to Count 14, the Court finds an obvious temporal link between Dean Kirkland's invitation to Talbott to go on the trip to New Mexico and Talbott's recommendations and votes for the Local 33 health plan to increase the percentage of funds it was permitted to invest with CCI.

Having considered all of the evidence, and, in particular, the temporal relationship between Dean Kirkland's statements of intent to John Lontine, Barclay Grayson, and Jeffrey Grayson; Dean Kirkland's giving of gratuities to Talbott; and Talbott's specific actions and decisions as a trustee, the Court finds the government has established the requisite link and proved beyond a reasonable doubt Element 3 of Count 9 and those parts of Counts 10 and 14 involving Dennis Talbott as recipient of the charged gratuities [20] as follows:

---

**20.** Pursuant to his Plea Agreement with the government on November 19, 2002, Dennis Talbott pled guilty to the felony crime of Accepting a Gratuity in Connection With Duties as Trustee for Certain Employee Benefit Plans

Dean Kirkland gave Talbott the September 1998 hunting trip to Clover Creek Ranch (Count 9) as a reward for and, thus, "because of" Talbott's actions and decisions earlier in 1998 that led to the pension plan's funding of its $1 million investment with CCI. Dean Kirkland gave Talbott the November 1998 hunting trip to Hubbard's Yellowstone Lodge (Count 10) as a reward for and, thus, "because of" Talbott's actions and decisions earlier in 1998 that led to the pension plan's initial decision to invest $1 million with CCI. Finally, Dean Kirkland gave Talbott the November 1999 hunting trip to The Lodge at Chama in New Mexico as a reward for and, thus, "because of" Talbott's actions and decisions in early 1999 to recommend and to vote for an increased percentage of the Local 33 health plan assets to be invested with CCI.

*Verdicts.* Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Count 9 and all of the elements of Counts 10 and 14 to the extent they charge Dean Kirkland with illegally giving gratuities to Dennis Talbott. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of each of these Counts.

c. *Count 10: Gratuity to Blaine Newman*

■ Blaine Newman was a trustee of at least one of the Eighth District plans. Newman consistently voted in favor of CCI. At CCI's expense, he went on the November 1998 hunting trip to Hubbard's Yellowstone Lodge together with Robert Legino, Robert Mayhew, Dennis Talbott, and Gary Kirkland. Dean Kirkland gave Newman this gratuity in 1998 when, as noted, Dean Kirkland expressed a general intent to give clients such trips to reward

and to "take care" of them. There is, however, not any evidence that explains the nature of the relationship between Dean Kirkland and Newman and insufficient evidence from which the Court can discern Dean Kirkland's state of mind when he gave this gratuity to Newman in particular. Thus, the government did not prove beyond a reasonable doubt the necessary link between Dean Kirkland's giving of this gratuity to Newman and any of Newman's particular past actions and decisions as an Eighth District trustee. Under *Sun–Diamond*, therefore, the government has failed to prove beyond a reasonable doubt Element 3 of this count.

*Verdict.* Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a reasonable doubt all of the elements of Count 10 to the extent it charges Dean Kirkland with illegally giving a gratuity to Blaine Newman. Accordingly, the Court finds Dean Kirkland is **NOT GUILTY** of that part of Count 10 involving Blaine Newman as recipient of the charged gratuities.

d. *Counts 10, 14 and 18: Gratuities Given to Robert Mayhew*

■ Robert Mayhew was a trustee of the Eighth District plans. Between 1995 and 2000, Mayhew voted consistently in favor of CCI each time the Eighth District trustees made decisions involving CCI. Over the years, Mayhew developed a close personal friendship with Robert Legino. After Legino had been on several hunting trips with Dean Kirkland, Legino asked Dean Kirkland to invite Mayhew along. Dean Kirkland then invited Mayhew to go on the November 1998 hunting trip to Hubbard's Yellowstone Lodge (Count 10) and the November 1999 trip to The Lodge at Chama in New Mexico (Count 14).[21] In addition, Dean Kirkland gave Mayhew a

___

with respect to the September 1998 hunting trip in violation of 18 U.S.C. § 1954.

**21.** Pursuant to his Plea Agreement with the government on September 5, 2002, Robert Mayhew pled guilty to the misdemeanor

Weatherby rifle in January 2000 (Count 18) at the same time that he gave one to Legino (Count 17).

Dean Kirkland spoke frequently with Mayhew by telephone. There is, however, little specific evidence about the nature of the relationship between them when he gave gratuities to Mayhew. In light of the fact that Mayhew was Legino's friend first and received his initial invitation to go on a Dean Kirkland hunting trip at Legino's request in 1998, it is more likely that Dean Kirkland invited Mayhew to please Legino rather than to reward Mayhew or to ensure Mayhew would take specific future action to benefit Dean Kirkland and CCI.

The Court notes Mayhew's candid testimony that from his perspective he received these gratuities from Dean Kirkland because he was a trustee of the Eighth District plans, which had money invested with CCI. Although Mayhew admitted it was wrong for him to accept these gratuities, particularly after May 1999 when the Eighth District set $100 limits for such gifts, Mayhew's state of mind is not sufficient to prove beyond a reasonable doubt Dean Kirkland's intent and the requisite link from Dean Kirkland's perspective between the things of value that Dean Kirkland gave to Mayhew and Mayhew's actions and decisions as a trustee. As noted, even if Dean Kirkland gave Mayhew gratuities merely because of Mayhew's status as an Eighth District trustee, that fact is insufficient to sustain the government's burden under *Sun–Diamond.* The Court, therefore, finds the government has failed to prove beyond a reasonable doubt Element 3 of these counts.

*Verdicts.* Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a rea-

sonable doubt all of the elements of Counts 10, 14, and 18 to the extent they charge Dean Kirkland with illegally giving gratuities to Robert Mayhew. Accordingly, the Court finds Dean Kirkland is **NOT GUILTY** of those parts of Counts 10, 14, and 18 involving Robert Mayhew as recipient of the charged gratuities.

e. *Counts 1, 2, 5, 8, 10, 14, 17, and 19: Gratuities Given to Robert Legino Count 1*

■ With respect to Count 1 against Dean Kirkland, the Court finds the following additional facts beyond a reasonable doubt:

As noted, Robert Legino was a trustee of various Eighth District plans, including the Pension Plan, the Annuity Plan, and the Holiday Fund. He was also a co-chairman of the Pension Plan. Dean Kirkland first met Legino when Dean Kirkland began to work full-time for CCI, but only after he visited Legino's Denver office several times and Legino finally agreed to see him. Dean Kirkland quickly learned Legino was also an avid hunter. After about six months, Dean Kirkland and Legino were very friendly, and, as noted, they came to regard one another as "grandfather" and "son" respectively.

At the end of 1995, the Eighth District plans had entrusted approximately $8.4 million with CCI. During this period, Dean Kirkland frequently telephoned James Riney, another Eighth District trustee. After Dean Kirkland inquired of Riney whether it was true that Riney and Legino "controlled" the Eighth District trusts, Dean Kirkland took Legino on the May 1996 hunting trip in Sitka, Alaska. Although Dean Kirkland also invited Riney to go on that trip, Riney declined.[22] In

crime of Causing the Administrator of Certain Plans to Fail to Include Certain Transactions in an Annual Report with respect to the November 1999 hunting trip to The Lodge at

Chama in New Mexico in violation of 28 U.S.C. § 1131.

**22.** As noted below in the Court's findings pertaining to Counts 22–29 against Robert

October 1996, Dean Kirkland took Legino on a hunting trip at Oxbow Ranch. At the end of 1996, the Eighth District plans had invested approximately $27 million with CCI. ·

In April 1997, Dean Kirkland made reservations for a September hunting trip in Alaska, and, in May 1997, Dean Kirkland took Legino hunting in Alaska. In July 1997, Legino voted in favor of moving approximately $14 million in Eighth District pension funds to CCI's management. In September 1997, Dean Kirkland gave Legino another hunting trip to Alaska and related expenses (Count 1).

By the time Dean Kirkland took Legino hunting in May 1997, which is the last trip before the September 1997 trip charged in Count 1, Dean Kirkland had established a significant "reservoir of good will" with Legino and they had forged a personal relationship beyond their common business interests. By this point, the Eighth District plans had increased the amount of their CCI-managed funds from approximately $8.4 million (at the end of 1995) to approximately $27 million.

The Court notes Legino voted in favor of moving plan funds to CCI in July 1997. The government, however, did not prove beyond a reasonable doubt that Dean Kirkland took Legino on the September hunting trip charged in Count 1 as a reward for Legino's July vote. Indeed, this September hunting trip was planned in April, and there is not any basis for the Court to conclude Dean Kirkland knew then that Legino would vote to move plan funds to CCI in July.

The government also did not prove any specific link between Dean Kirkland's giving of the September 1997 trip and Legino's specific past or anticipated actions or decisions in favor of CCI. Even though Dean Kirkland expressed in 1998 a general intent to give hunting and fishing trips to trustees as a means of rewarding those clients who gave, maintained, or increased business with CCI, the evidence is insufficient under *Sun–Diamond* for the Court to find beyond a reasonable doubt that Dean Kirkland had this same intent to reward Legino when Dean Kirkland gave Legino the September 1997 trip. Under *Sun–Diamond,* therefore, the government has failed to prove beyond a reasonable doubt Element 3 of this count.

***Verdict—Count 1.*** Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a reasonable doubt all of the elements of Count 1 as charged against Dean Kirkland. Accordingly, the Court finds Dean Kirkland is **NOT GUILTY** of Count 1.

#### Count 2

With respect to Count 2 against Dean Kirkland, the Court finds the following additional facts beyond a reasonable doubt:

In October 1997, Legino voted in favor of amending Eighth District investment guidelines to permit the Eighth District to increase the percentage of the trusts' assets available for investment with CCI. In November 1997, Dean Kirkland took Legino hunting at Oxbow Ranch in Oregon (Count 2). By the end of 1997, the Eighth District's CCI-managed funds totaled approximately $43 million.

The government, however, did not have any more evidence about Dean Kirkland's state of mind when he gave Legino the November 1997 trip than it had concerning Dean Kirkland's intent two months earlier. Thus, the Court also finds the government did not prove any specific link between

---

Legino, Riney later criticized Legino for accepting this trip and Legino replied, "I should never have asked you."

Dean Kirkland's gift of the November 1997 trip and Legino's past or anticipated actions or decisions in favor of CCI and, therefore, did not prove Element 3 of this count.

*Verdict—Count 2.* Having weighed and evaluated all of the evidence, the Court finds government did not prove beyond a reasonable doubt all of the elements of Count 2 as charged against Dean Kirkland. Accordingly, the Court finds Dean Kirkland is **NOT GUILTY** of Count 2.

### Counts 5, 8, and 10

With respect to Counts 5, 8, and 10 against Dean Kirkland, the Court finds the following additional facts beyond a reasonable doubt:

In early 1998, Dean Kirkland began to plan the August 1998 hunting trip to Africa, which was taken by Dean Kirkland, Larry Kirkland, Gary Kirkland, Deane Shaver (another trustee), Clark Knauss, and Robert Legino. On April 3, 1998, in preparation for the Africa trip, Dean Kirkland ordered and paid $300 down toward the purchase of at least 3 Sako .416 hunting rifles from Northwest Armory in Milwaukie, Oregon.[23] On May 8, 1998, after he paid the balance due on one of these Sako rifles, serial number 892676, Dean Kirkland signed an ATF form as "transferor" of this rifle and gave it to Legino for him to use during the Africa hunting trip (Count 5). After Dean Kirkland arranged to have the rifle shipped to Legino and Legino used it at his home range, the rifle needed to be repaired and Legino returned it to Northwest Armory for that purpose. Although Northwest Armory repaired the rifle, the current whereabouts of the rifle are unknown. Nonetheless, this rifle was a "thing of value" when Dean Kirkland gave it to Legin.

For several days in August–September 1998, Legino participated in the Africa hunting trip that Dean Kirkland gave to him (Count 8). CCI paid at least $13,000 for Legino to go on this trip, which is the most generous gratuity Dean Kirkland gave Legino from 1996 until 2000.

Thereafter in November 1998, as previously noted, Dean Kirkland also hosted the hunting trip to Hubbard's Yellowstone Lodge in Montana, which Legino attended along with Newman and Mayhew. While they were on this trip, other Eighth District trustees voted to withdraw $10 million from CCI management because of growing concerns about Wilshire. As soon as Dean Kirkland learned of this "trouble in the Eighth," he reacted irately and immediately went to Legino to complain that the trustees had "taken" $10 million "from me." Legino, in turn, immediately started making telephone calls from the Lodge, but he realized there was little that could be done about the decision while they were away. Nonetheless, without even pausing to consider the Wilshire issues that led to the trustees' vote, Legino assured Dean Kirkland he would take care of the matter on his return. He did. Indeed, in early 1999, Legino called a special meeting of the Eighth District Investment Committee, which voted to reverse the decision to withdraw $10 million from CCI management.

As noted, by the time Dean Kirkland gave Legino the gratuities underlying Counts 5, 8, and 10, Dean Kirkland had expressed his general intent to give such things of value to trustees as a reward for actions or decisions benefiting CCI. Even

---

**23.** In Exhibit 23, documents from Northwest Armory reflect two apparently different transactions by Dean Kirkland on April 3, 1998, involving Sako rifles. The exhibit page numbered KIR002684 shows Dean Kirkland ordered two Sako rifles at $649.99 each at 12:33 p.m. on that date. The exhibit page numbered KIR002685 shows Dean Kirkland also ordered three Sako rifles at $649.99 each at 12:33 p.m. on April 3, 1998.

so, Dean Kirkland testified his only motivation for giving Legino these and other gratuities was Dean Kirkland's close personal relationship with Legino. The Court finds this testimony was not credible and that Dean Kirkland frequently used the excuse that such trips were for "just friends" or for "family" to deflect attention from the fact that he was giving expensive gratuities to trustees.

Even if Dean Kirkland was motivated in part by his friendship with Legino, however, the Court finds the business relationship between CCI and the Eighth District substantially overshadowed the personal aspects of Dean Kirkland's relationship with Legino during this time. The government presented overwhelming evidence that the value of every material thing Dean Kirkland gave to Legino ultimately was reimbursed to Dean Kirkland by CCI, including the cost of personal gifts such as photos of Dean Kirkland's young children. In 1998 alone, Dean Kirkland's gifts to Legino cost CCI at least $18,000. Indeed, it is implausible that Jeffrey Grayson would have permitted Dean Kirkland to spend so extravagantly on Legino if Legino had not been influential in all of the Eighth District's actions and decisions that favored CCI. In any event, Dean Kirkland's reflexive response to go to Legino to reverse the "$10 million decision" illustrates the predominantly business nature of their relationship at that time as well as the fact that Dean Kirkland felt free to ask Legino to seek relief from that decision as a favor.

Having considered all of the evidence pertinent to Element 3 of Counts 5, 8, and 10, the Court finds beyond a reasonable doubt that Dean Kirkland's statements of intent to John Lontine, Barclay Grayson, and Jeffrey Grayson also reflect Dean Kirkland's state of mind when he gave Legino the gratuities underlying Counts 5, 8, and 10, and that a substantial factor in Dean Kirkland's motivation to give these gratuities was his intent to reward Legino for his past and anticipated actions and decisions for the benefit of CCI. These actions and decisions included Legino's July 1997 vote in favor of moving approximately $14 million in Eighth District pension funds to CCI and his October 1997 vote to amend the Eighth District Pension Plan guidelines in a way that was favorable to CCI and necessarily anticipated future investment opportunities for CCI. The government, therefore, has met its burden of proof as to Element 3 of these counts.

***Verdicts on Counts 5, 8, and 10.*** Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Counts 5 and 8 and all of the elements of Count 10 to the extent it charges Dean Kirkland with illegally giving gratuities to Robert Legino. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of each of these Counts.

### Count 14

With respect to Count 14, the Court finds the following additional facts beyond a reasonable doubt:

As noted, Dean Kirkland hosted a hunting trip to The Lodge at Chama in New Mexico, including related expenses, for Robert Legino, Gary Kirkland, Larry Kirkland, Robert Mayhew, Dennis Talbott, and two others. By all accounts, The Lodge at Chama in New Mexico is an elegant resort and caters to a high-end market. CCI paid approximately $6,400 for Legino to go on this trip.[24]

---

24. Although it appears Dean Kirkland may have given Legino a new Browning shotgun valued at about $1,300 for Legino to use on this hunt, this gratuity is not charged and the

Dean Kirkland began planning this trip in the spring of 1998. In early 1999, Shelly Connover sent a video, a brochure, and a questionnaire to those who would be going. It was during this time that Legino was actively involved in the effort to reverse the decision made by the Eighth District trustees in November 1998 to take $10 million away from CCI. As noted, Legino called a special meeting of the Investment Committee in January 1999 for this purpose. In February 1999, the decision was, in fact, reversed as a result of the votes of Legino, Blaine Newman, Robert Mayhew, and other trustees. In November 1999, before going hunting with Dean Kirkland in New Mexico, Legino and Mayhew voted to terminate the services of another investment manager and to invest an additional $10 million with CCI. By the end of 1999, the Eighth District trusts had approximately $53 million under CCI management.

Having considered all of the evidence on the question of Dean Kirkland's specific intent with respect to Count 14, the Court finds beyond a reasonable doubt that Dean Kirkland's previous statements of intent also reflect his state of mind when he gave Legino the gratuity underlying Count 14 and that a substantial factor in Dean Kirkland's motivation to give Legino this gratuity was Dean Kirkland's intent to reward Legino for his past and anticipated actions and decisions that benefited CCI. In particular, the Court finds Dean Kirkland specifically intended to reward Legino for his successful efforts in early 1999 to reverse the decision to take $10 million away from

CCI and his vote in November 1999 to invest an additional $10 million with CCI. The government, therefore, has met its burden of proof as to Element 3 of this count.

***Verdict on Count 14.*** Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Count 14 to the extent it charges Dean Kirkland with illegally giving gratuities to Robert Legino. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland is GUILTY of that count.

### Count 17

■ With respect to Count 17, the Court finds the following additional facts beyond a reasonable doubt:

In January 2000, Dean Kirkland purchased two Weatherby Accumark rifles from Northwest Armory at a cost of $1,266.67 each to give to Legino and Robert Mayhew for them to use on a hunt in the fall of that year.[25] On January 13, 2000, Dean Kirkland signed an ATF form as "transferor" and gave one of the Weatherby rifles to Legino and the other to Robert Mayhew. Northwest Armory shipped these rifles to Cheyenne, Wyoming, where Mayhew signed a receipt when he picked them up.[26] Legino did not like this rifle, however, and gave it back to Dean Kirkland at some point. Nonetheless, this rifle was a "thing of value" when Dean Kirkland gave it to Legino.

Court did not include its value in the $6,400 estimate of the cost to CCI for Legino to go on this hunt.

25. As noted, CCI went into receivership in September 2000, and, despite their personal relationship, it appears Legino did not participate in any hunting trips thereafter with Dean Kirkland.

26. After the Grand Jury returned its Indictment, Dean Kirkland spoke with Robert Mayhew and suggested Mayhew, if asked, should state Dean Kirkland merely loaned these rifles to Mayhew and Legino. Mayhew, however, reminded Dean Kirkland that they both had signed ATF documents indicating Dean Kirkland had transferred ownership of the rifles.

By this time, Dean Kirkland was engaged in a pattern of repeatedly giving Legino expensive hunting trips and firearms to use on such trips. As noted, a substantial factor in Dean Kirkland's motivations to give these gratuities to Legino was Dean Kirkland's intent to reward Legino for his past actions and decisions that benefited CCI. Following on the heels of the November 1999 hunting trip to The Lodge at Chama in New Mexico, the gift of the Weatherby rifle was no different. The Court, therefore, finds beyond a reasonable doubt that a substantial factor in Dean Kirkland's decision to give Legino this gratuity was Dean Kirkland's intent to reward Legino for his past actions and decisions that benefited CCI, including Legino's actions and decisions in 1998 and 1999 as detailed above. The government, therefore, has met its burden of proof as to Element 3 of this count.

*Verdict on Count 17.* Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Count 17 to the extent it charges Dean Kirkland with illegally giving gratuities to Robert Legino. Accordingly, the Court finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of that count.

### Count 19

 With respect to Count 19, the Court finds the following additional facts beyond a reasonable doubt:

In February 2000, Legino voted with other Eighth District trustees to invest an additional $5 million with CCI. In March 2000, Dean Kirkland arranged for Barclay Grayson, Dean Kirkland, Gary Kirkland, Larry Kirkland, and Robert Legino to travel to Argentina at CCI's expense. On this trip, they visited a lumber mill and timber holdings in which CCI had invested certain union trust funds.[27] After doing so, they all went hunting for several days at CCI's expense. CCI spent approximately $4,375 for Legino's share of the trip.

Having considered all of the evidence pertinent to Element 3 of Count 19, the Court notes there is not any basis to suggest Dean Kirkland had a change of heart or change of mental state when he gave Legino the Argentina hunting trip in March 2000. The Court, therefore, finds beyond a reasonable doubt that Dean Kirkland's previous statements of intent also reflect his state of mind at that time and that a substantial factor in Dean Kirkland's motivation to give this gratuity was his intent to reward Legino for his past and anticipated actions and decisions for the benefit of CCI as detailed above, including Legino's participation in the February 2000 decision of the Eighth District trustees to invest an additional $5 million with CCI. The government, therefore, has met its burden of proof as to Element 3 of this count.

*Verdict on Count 19.* Having weighed and evaluated all of the evidence, the Court finds the government has proven beyond a reasonable doubt all of the elements of Count 19 to the extent it charges Dean Kirkland with illegally giving gratuities to Robert Legino. Accordingly, the Court finds Dean Kirkland is **GUILTY** of that count.

f. *Counts 3, 12, 13, 14, 16, 19, 20, and 21: Gratuities Given to Gary Kirkland*

 The remaining Counts against Dean Kirkland charge him with illegally

---

27. Although the trusts on which Gary Kirkland served had funds invested in these properties, it is unclear whether the Eighth District plans also had any interest in these holdings.

giving to Gary Kirkland the following gifts: 1998 legal fees and fines (Count 3), the July 1999 fishing trip to Tsuniah Lake Lodge in British Columbia (Count 12), a September 1999 hunting trip in Montana (Count 13), the November 1999 hunting trip to The Lodge at Chama in New Mexico (Count 14), the December 1999 hunting trip to Mexico (Count 16), the March 2000 hunting trip in Argentina (Count 19), the May 2000 fishing trip in Alaska (Count 20), and the September, 2000 hunting trip in Alaska (Count 21). As noted, Gary Kirkland is Dean Kirkland's father and was a trustee and co-chairman of the trusts of two plans based in Portland, Oregon, that invested funds with CCI: the 401(k) Retirement Fund of the Office of Professional Employees International Union (OPEIU), Local 11 (401(k) Plan) and the Western States Local Union Trust Fund of the OPEIU. In addition, Gary Kirkland was a trustee and co-chairman of the Western States Pension Trust.

Before Dean Kirkland went to work for CCI, the 401(k) Plan already had all of its funds invested with CCI. During the years Dean Kirkland worked for CCI, the value of the 401(k) Plan funds invested with CCI increased from approximately $20 million at the end of 1995 to approximately $43 million at the end of 2000 due in part to increased union membership and to CCI's early successes in managing the fund. In addition, by the end of 1995, the Local 11 health plan trustees had invested with CCI approximately $7 million of assets. By the end of 2000, the Local 11 health plan had approximately $10.8 million under CCI management.

Dean Kirkland regularly organized the many hunting and fishing trips that Gary Kirkland and Larry Kirkland participated in at CCI's expense. Dean Kirkland, however, specifically denied he had any intent to reward his father for his actions and decisions as a trustee by including him on

these trips. In particular, Dean Kirkland emphasized Gary Kirkland and the Western States plans were not his clients.

Although Jeffrey Grayson and Barclay Grayson did not permit Dean Kirkland to receive any commissions arising from the investment of funds by trusts on which Gary Kirkland served, the government argued Dean Kirkland, nonetheless, had a "phantom ownership interest" in CCI and, therefore, a stake in business from the trusts on which Gary Kirkland served. The government contends this circumstance weighs in favor of a finding that Dean Kirkland had the requisite intent with respect to the remaining gratuities counts involving gifts to Gary Kirkland. Even if such an inference is reasonable, however, the Court finds this evidence is not enough to sustain the government's burden of proof under *Sun–Diamond*.

Despite all of the evidence the Court has summarized with respect to Dean Kirkland's intent to reward other trustees for doing business with CCI, there is not any evidence from which the Court can find beyond a reasonable doubt that Dean Kirkland's intent to reward other trustees extended to rewarding his father. Barclay Grayson, as noted, testified credibly that Jeffrey Grayson authorized Dean Kirkland to include Gary Kirkland and Larry Kirkland on the trips in order to keep Gary Kirkland, the CCI client, "happy." At best, the government could have argued Dean Kirkland aided and abetted CCI and/or Jeffrey Grayson by illegally giving these gratuities to Gary Kirkland. The government, however, explicitly limited the theory of its case against Dean Kirkland to his liability as a principal.

Although it is plausible that CCI and Jeffrey Grayson may have intended to give gratuities to Gary Kirkland "because of" his actions and decisions as a trustee, the government did not prove beyond a rea-

sonable doubt that Dean Kirkland acted with the requisite intent when he participated in giving these things of value to Gary Kirkland. Under *Sun–Diamond,* therefore, the government has failed to prove beyond a reasonable doubt Element 3 of these counts.

### Verdicts on Counts 3, 12, 13, 14, 16, 19, 20, and 21.

Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a reasonable doubt all of the elements of Counts 3, 12, 13, 14, 16, 19, 20, and 21 to the extent they charged Dean Kirkland with illegally giving gratuities to Gary Kirkland. Accordingly, the Court finds Dean Kirkland is **NOT GUILTY** of these counts.

### III. Gratuities: Counts 22–39 Against Robert Legino.

As to each of the gratuities counts charged against Robert Legino, the government must prove beyond a reasonable doubt the following elements:

1. As alleged in each court, Robert Legino received from Dean Kirkland and CCI the described thing of value on or about the dates alleged;

2. Robert Legino was a trustee of one or more plans subject to 18 U.S.C. § 1954; and

3. Robert Legino received the thing of value because of one or more of his specific actions or decisions as a trustee.

### A. Elements 1 and 2.

■ In general, Robert Legino concedes Elements 1 and 2 of each of the gratuities counts against him. Thus, the Court need not summarize the overwhelming and essentially uncontradicted evidence that establishes Robert Legino, as a trustee, received the various gratuities as alleged. In any event, the Court has considered all of the evidence and finds the

following additional facts pertinent to Elements 1 and 2 beyond a reasonable doubt:

Robert Legino, as a trustee of one or more plans subject to § 1954, received each of the following gratuities on or about the dates alleged:

Count 22: In September 1997, a hunting trip in Alaska.

Count 23: In November 1997, a hunting trip to Oxbow Ranch.

Count 24: In May 1998, a Sako rifle.

Count 25: In August–September 1998, a hunting trip in Africa and related expenses.

Count 26: In November 1998, a hunting trip to Hubbard's Yellowstone Lodge in Montana.

Count 27: In November 1999, a hunting trip to The Lodge at Chama in New Mexico.

Count 28: In January 2000, a Weatherby rifle.

Count 29: In March 2000, a hunting trip in Argentina.

Having considered all of the evidence, the Court finds beyond a reasonable doubt that the government has proved Elements 1 and 2 of each of the gratuities counts against Robert Legino.

### B. Element 3: "Because of" Robert's Legino's Actions or Decisions.

#### 1. Definition.

■ As noted, for each § 1954 count against Robert Legino, the government also must prove beyond a reasonable doubt that Robert Legino received each thing of value "because of" one or more of his actions or decisions "relating to any question or matter" concerning the particular plans on which he served as trustee. In particular, to comply with *Sun–Diamond,* the government must prove a motivational link between the thing of value that Rob-

ert Legino received and at least one of his specific actions or decisions "for or because of which" he received it. Again, it is not enough under *Sun–Diamond* if Robert Legino received each gratuity merely because the trusts on which he served did business with Dean Kirkland and CCI. It is enough, however, if the government proved beyond a reasonable doubt that Robert Legino accepted the thing of value "because of" his specific actions or decisions that he anticipated making or as a reward for his specific past actions or decisions.

To prove Robert Legino accepted gratuities "because of" his specific actions or decisions as a trustee, therefore, the government must prove beyond a reasonable doubt as to each count that a substantial factor in Legino's motivation to receive the gratuity was one or more of his specific actions or decisions as trustee. A "substantial factor" is an important or material factor and not one that is insignificant. *Virginia Bankshares,* 501 U.S. at 1112, 111 S.Ct. 2749. The government, however, need not prove this was the only factor in Legino's decision to receive the thing of value.

### 2. *Findings.*

■ The Court incorporates all of its previous findings. Other than Legino's own testimony that he accepted gratuities from Dean Kirkland only because of their close personal relationship, there is little direct evidence about Legino's intent when he received the gratuities underlying these counts.

In this regard, the Court finds the following additional facts beyond a reasonable doubt:

As noted, Legino invited James Riney, another Eighth District trustee, to go on the May 1996 fishing trip to Sitka, Alaska. Legino said Dean Kirkland, "the big kid," put this trip together because "we" [the Eighth District trustees] "were doing business" with CCI. Riney declined to go on the trip. Later when Riney criticized Legino for accepting this trip, Legino replied, "I should never have asked you."

When Legino was showing videos and photographs of the 1998 Africa trip to other trustees, the Chairman of the Executive Board of Local 68 commented to Riney: "We see these pictures, we see these videos, we know where our money is. Is this right?" When Riney told Legino the Executive Board was concerned about Dean Kirkland and CCI providing the trips, Legino responded, "Prove it, you asshole."

Having considered all of the evidence on Element 3 of the gratuities counts against Legino, the Court rejects as not credible Legino's testimony that he did not really know CCI was paying for the trips and that he always assumed Dean Kirkland personally was taking care of Legino's expenses because of their friendship. On the contrary, Legino knew CCI was paying for the trips. Even so, he was unwilling to admit that fact when he challenged Riney to "prove it."

In addition, the Court finds Legino became intensely loyal to Dean Kirkland over time and, by extension, to CCI. Ultimately, Legino's personal relationship with Dean Kirkland obviously influenced Legino's actions and decisions as an Eighth District trustee when, for example, Legino took such extraordinary steps in late 1998 and early 1999 to reverse the decision of the Eighth District trustees to take $10 million from CCI. In addition, the Court is convinced Legino knew there were serious ethical problems with his conduct.

The fact that Legino thought Dean Kirkland and CCI gave him these many gratuities because he was an Eighth District trustee doing business with CCI is not, as noted, sufficient under *Sun–Dia-*

*mond* to prove Legino accepted gratuities from Dean Kirkland and CCI "because of" Legino's actions and decisions as a trustee. In addition, although the Court finds Legino's substantial efforts to reverse the "$10 million decision" undoubtedly breached his fiduciary duties to the Eighth District trusts, that fact also is insufficient to prove a violation of § 1954 under *Sun–Diamond* because there is not any evidence that proves Legino's specific state of mind when he received any particular gratuity. Similarly, there is not any evidence that links Legino's acceptance of a particular gratuity to one or more of his specific actions or decisions. Thus, in the absence of any other evidence about Legino's intent, the Court concludes the government did not prove beyond a reasonable doubt that a substantial factor in Legino's motivations to accept the gratuities given by Dean Kirkland was one or more of Legino's specific actions or decisions as a trustee. Under *Sun–Diamond,* therefore; the government has failed to prove beyond a reasonable doubt Element 3 of each of the gratuities counts against Legino.

### C. Verdicts on Counts 22, 23, 24, 25, 26, 27, 28, and 29.

Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a reasonable doubt all of the elements of Counts 22, 23, 24, 25, 26, 27, 28, and 29 that charge Robert Legino with illegally receiving gratuities in violation of 18 U.S.C. § 1954. Accordingly, the Court finds Robert Legino is **NOT GUILTY** of these Counts.

### IV. Gratuities: Counts 30–41 [28] Against Gary Kirkland.

As to each of the remaining gratuities counts charged against Gary Kirkland, the

---

**28.** At the close of the government's case-in-chief, the Court granted Gary Kirkland's Rule 29 Motion as to Count 32, which charged

government must prove beyond a reasonable doubt the following elements:

1. As alleged in each count, Gary Kirkland received from Dean Kirkland and/or CCI the thing of value on or about the dates alleged;

2. Gary Kirkland was a trustee of one of more plans subject to 18 U.S.C. § 1954; and

3. Gary Kirkland received the thing of value because of one or more of his specific actions or decisions as a trustee.

### A. Elements 1 and 2.

■ Gary Kirkland did not make any specific concession concerning Elements 1 and 2 of each of the gratuities counts against him. Nonetheless, the evidence is overwhelming and uncontradicted. The Court, therefore, finds beyond a reasonable doubt that the government proved Gary Kirkland, as a trustee of one or more plans subject to 18 U.S.C. § 1954, received the following things of value at CCI's expense as alleged in the Second Superseding Indictment:

Count 30: In September 1997, a hunting trip in Alaska.

Count 31: In November 1997, a hunting trip to Oxbow Ranch.

Count 33: In August–September 1998, a hunting trip to Africa and related expenses.

Count 34: In November 1998, a hunting trip and related expenses to Hubbard's Yellowstone Lodge in Montana.

Count 35: In July 1999, a hunting trip to Tsuniah Lake Lodge in British Columbia.

Gary Kirkland with illegally receiving the gratuity of legal fees and fines in 1998.

Count 36: In September 1999, a hunting trip in Montana.

Count 37: In November 1999, a hunting trip to The Lodge at Chama in New Mexico.

Count 38: In December 1999, a hunting trip in Mexico.

Count 39: In March 2000, a hunting trip in Argentina.

Count 40: In May 2000, a fishing trip in Alaska.

Count 41: In September 2000, a hunting trip in Alaska.

Having considered all of the evidence, the Court finds beyond a reasonable doubt that the government has proved Elements 1 and 2 of each of the gratuities counts against Gary Kirkland.

**B. Element 3: "Because of" Gary Kirkland's Actions or Decisions.**

1. *Definition.*

As noted, for each § 1954 count against Gary Kirkland, the government also must prove beyond a reasonable doubt that Gary Kirkland received each thing of value "because of" one or more of his actions or decisions "relating to any question or matter" concerning the particular plans on which he served as trustee. In particular, the government must prove a motivational link between the thing of value Gary Kirkland received and at least one of his specific actions or decisions "for or because of which" he received it. Again, it is not enough under *Sun–Diamond* if Gary Kirkland received each gratuity merely because the trusts on which he served did business with CCI. It is enough, however, if the government proved beyond a reasonable doubt that Gary Kirkland accepted the thing of value "because of" his specific actions or decisions that he anticipated making or as a reward for his specific past actions or decisions.

To prove Gary Kirkland accepted gratuities "because of" his specific actions or decisions as a trustee, therefore, the government must prove beyond a reasonable doubt as to each count that a substantial factor in Gary Kirkland's motivation to receive the thing of value was one or more of Gary Kirkland's specific actions or decisions as trustee. A "substantial factor" is an important or material factor and not one that is insignificant. *Virginia Bankshares*, 501 U.S. at 1112, 111 S.Ct. 2749. The government, however, need not prove this was the only factor in Gary Kirkland's decision to receive the thing of value.

2. *Findings.*

The Court incorporates all of its previous findings.

 There is not any direct evidence that establishes Gary Kirkland's specific intent when he received these various gratuities at CCI's expense. Even before he took his first CCI-funded trip, however, Gary Kirkland tried to have CCI named as investment manager for one of the Western States plans because CCI had long been a successful manager for the Local 11 401(k) plans. In addition, Gary Kirkland's early actions and decisions that benefited CCI occurred when CCI produced positive returns for the Western States plans. Of course, Gary Kirkland argues this fact negates any improper motivation on his part. Nonetheless, the government points to several factors and argues the Court should find Gary Kirkland had the requisite intent.

In particular, the government emphasizes the gross value of all of the gratuities that Gary Kirkland accepted at CCI's expense when he was a trustee client of CCI. In this regard, the Court finds the following additional facts beyond a reasonable doubt:

Before the September 1997 hunting trip charged against Gary Kirkland in Count 30, Gary Kirkland went on four CCI-sponsored hunting or fishing trips at an approximate value to him of $3,100. In addition, the value to Gary Kirkland of the eleven trips charged in Counts 30–41 (excluding the value of Count 32) is approximately $50,700. Thus, between 1995 and 2000, CCI paid for gratuities to Gary Kirkland valued at approximately $53,800.

The government also argues Gary Kirkland engaged in extraordinary advocacy on behalf of CCI. In this regard, the Court finds the following additional facts beyond a reasonable doubt:

During the period Gary Kirkland accepted gratuities from CCI, he was relentless, although unsuccessful, in his persistent efforts to have CCI become the investment manager for the Western States Office Employees Pension Trust. In addition, Gary Kirkland repeatedly pressured those trustees and other professionals who did not "get with the [CCI] program." Finally, from late 1999 through early 2000, Gary Kirkland worked behind the scenes to remove a footnote in the 1998 audit report of the Local 11 401(k) Plan that was unfavorable to CCI. The footnote referred to Wilshire's financial problems and the assumption of Wilshire's notes by the shell company, Sterling Capital. Although accountants included the footnote pursuant to generally accepted accounting principles, Gary Kirkland refused to sign the audit report unless the footnote was removed. Ultimately, at Gary Kirkland's strong insistence, the accountants acquiesced in removing the footnote. Thereafter, Gary Kirkland failed to tell the trustees of the Local 11 Health and Welfare Trust (which, as noted, also had funds under CCI Management) about the concerns raised in the footnote involving Wilshire.

The fact that Gary Kirkland accepted gratuities valued at more than $53,000 from CCI while he simultaneously engaged in undue advocacy on behalf of CCI is, nonetheless, insufficient under *Sun–Diamond* because there is not any evidence to prove Gary Kirkland's specific state of mind when he received any gratuity or to link his receipt of a particular gratuity to any of his specific actions or decisions as a trustee. In fact, the evidence suggests Gary Kirkland had various plausible motivations when he accepted these gratuities, including the possibility that he went on these CCI-funded trips simply because he could. Acting opportunistically, however, is not the same as accepting a gratuity "because of" one's specific actions or decisions as a trustee.

In the absence of any evidence about Gary Kirkland's specific intent, the Court concludes the government did not prove beyond a reasonable doubt that a substantial factor in Gary Kirkland's motivations to receive the gratuities given by CCI were one or more of Gary Kirkland's specific actions or decisions as a trustee. Under *Sun–Diamond*, therefore, the government has failed to prove beyond a reasonable doubt Element 3 of this count.

### C. Verdicts on Counts 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, and 41.

Having weighed and evaluated all of the evidence, the Court finds the government did not prove beyond a reasonable doubt all of the elements of Counts 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, and 41 that charge Gary Kirkland with illegally receiving gratuities in violation of 18 U.S.C. § 1954. Accordingly, the Court finds Gary Kirkland is **NOT GUILTY** of these counts.

### V. Supplemental Analysis of § 1954 and Sun Diamond.

From 1995 to 2000, Dean Kirkland and CCI spent tens of thousands of dollars to

repeatedly bestow gratuities on targeted union trustees who regularly made decisions and took actions that benefited Dean Kirkland and CCI. Nonetheless, Robert Legino and Gary Kirkland eluded criminal liability under § 1954 in spite of their blatant and unethical conduct as trustees and the government's presentation of all of the considerable evidence against them. The Supreme Court's *Sun–Diamond* analysis as applied to the vagaries of § 1954 produced this anomalous outcome in the context of the matrix of the many gratuities Legino and Gary Kirkland accepted and their actions and decisions that benefited Dean Kirkland and/or CCI. In fact, the more gratuities Gary Kirkland and Legino accepted and the more frequently they took such actions or made such decisions, the more unlikely it became that the government could establish beyond a reasonable doubt the motivational link between a particular gratuity and one of their specific actions or decisions as required under § 1954 and the principles of *Sun–Diamond*.

In the case against Dean Kirkland, his own damning statements and the overwhelming evidence of his illegal actions provided abundant proof of his guilt. Unfortunately, however, evidence of a defendant's subjective state of mind linking the giving or receiving of a particular gratuity to a trustee's specific action or decision will rarely be found. Without such proof, all of the "common sense" inferences on which the government is forced to rely, as in this case, will generally fall short of proof beyond a reasonable doubt.

The Court agrees with the government that Congress could not have intended such an anomalous outcome. Nonetheless, the opaque language of § 1954 and the absence of useful guidance in *Sun–Diamond* leaves regulators, prosecutors, and trial courts with the confounding challenge of enforcement and adjudication. More-over, trustees and other fiduciaries whose actions fall within the scope of § 1954 and who work in a marketplace where gratuities seem to flow like gravy are not clearly on notice as to when their actions are criminal. Finally, and perhaps most important, § 1954 in its current form provides little, if any, protection to the public.

Although the goal of § 1954 is clear, that goal will remain elusive until Congress addresses the murkiness of the statutory language in light of *Sun–Diamond*. If anything good can come from the catastrophic collapse of CCI, let it be that Congress will take the steps necessary to revisit § 1954 and to write a law regulating the giving and receiving of gratuities that works.

### CONCLUSION

For these reasons, the Court directs the Clerk to enter its Verdicts as follows:

As to **Dean Kirkland**, the Court finds Defendant is **NOT GUILTY** of illegally giving gratuities to Robert Legino as charged in Counts 1 and 2; is **NOT GUILTY** of illegally giving gratuities to Gary Kirkland as charged in Counts 3, 12, 13, 14, 16, 19, 20, and 21; is **NOT GUILTY** of illegally giving a gratuity to Blaine Newman as charged in Count 10; and is **NOT GUILTY** of illegally giving gratuities to Robert Mayhew as charged in Counts 10, 14, and 18.

The Court also finds beyond a reasonable doubt that Dean Kirkland is **GUILTY** of illegally giving gratuities to John Lontine as charged in Counts 4, 7, 11, and 15; is **GUILTY** of illegally giving gratuities to Robert Legino as charged in Counts 5, 8, 10, 14, 17, and 19; is **GUILTY** of illegally giving gratuities to Dennis Talbott as charged in Counts 9, 10, and 14; is **GUILTY** of wire fraud as charged in Counts 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, and 54; and is **GUILTY** of obstruction

of justice for lying to federal agents on October 20, 2000, as charged in Count 55.

As to **Gary Kirkland**, the Court finds Defendant is **NOT GUILTY** of illegally receiving gratuities as charged in Counts 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, and 41.

As to Robert Legino, the Court finds Defendant is **NOT GUILTY** of illegally receiving gratuities as charged in Counts 22, 23, 24, 25, 26, 27, 28, and 29.

As to Forfeiture Counts 56 against Gary Kirkland and Dean Kirkland and Count 57 against Dean Kirkland only, the Court will conduct further proceedings in due course.

IT IS SO ORDERED.

1 – Exhibit A

**1995\***

All year:
Western States
to incl. CCI
in search for
Inv. Mgr.
GK

Jan.
Local 11 401k
approved
$2.7 mill. inv.
w/ CCI
GK

Jan.
8th Dist.
inv. Annuity
w/ CCI
RL, RM, BN

Mar.
8th Dist.
Holiday Fund
signed Agrmnt
to use CCI
as Inv. Mgr.
RL

Sep.
8th Dist.
inv. $5 mill. Pension
Funds w/ CCI
RL, RM, BN

11/3
Hunting,
Oxbow
GK

**\*END of 1995:**
- 8th Dist. Pension/Annuity Plans inv. approx. total of $8.4 mill. w/ CCI
- 8th Dist. Holiday Fund inv. approx. total of $800,000 w/ CCI
- Local 11 401(k) inv. approx. total of $20 mill. w/ CCI
- Local 11 Health and Welfare Trust inv. approx. total of $7 mill. w/ CCI

Charged

Uncharged

Decisions

**1996***

Jan.
8th Dist.
$5 mill. Pension
Funds inv. w/ CCI
RL

Mar.
Local 9
inv. $4 mill.
Pension funds
w/ CCI
JL

Apr.
Local 11 401(k)
waive contract term
(favorable to CCI)
GK

Jun.
8th Dist.
inv. $10 mill.
Pension Funds
w/ CCI
RL, RM

8/19
Fishing
Sitka
RL

10/31
Hunting
Okbow
RL, GK

Oct.
Local 11 401(k)
reached
$2.7 mill. funding
GK

Nov.
8th Dist.
inv. $5 mill.
Pension
Funds
w/ CCI
RL, RM

***END of 1996:**

- 8th Dist Pension/Annuity Plans inv. approx. total of $27 mill. w/ CCI
- 8th Dist. Holiday Fund inv. approx. total $1.8 mill w/ CCI
- Local 11 401(k) Plan inv. approx. total of $24 mill. w/ CCI
- Local 11 Health and Welfare Trust inv. approx. total of $8 mill. w/ CCI
- Local 9, Sheet Metal Pension inv. approx. total of $7.9 mill. w/ CCI

Charged Uncharged Decisions

3 – Exhibit A

**1997\***

2/21
Hunting
TREO
GK

5/16
Hunting
Sitka
RL

6/6
Fishing
Sitka
GK

9/9
Hunting
Alaska
RL, GK

11/19
Hunting
Oxbow
RL, GK, RM

Feb.
Local 11 401(k)
amended guidelines
(favorable to CCI)
GK

Jul.
8th Dist. Pension
Liquidate Non-CCI
inv. & inv. $14 mill.
Pension Funds w/ CCI
RL, RM, BN

Sep.
Local 9 Health
Plan inv.
$500,000 w/
CCI from
JL

Oct.
8th Dist. Pension
votes to amend
guidelines
(favorable to CCI)
RL, RM, BN

**\*END of 1997:**
- 8th Dist Pension inv. approx. total of $43 mill. w/ CCI
- 8th Dist. Holiday Fund inv. approx. total of $2.1 mill. w/ CCI
- Local 11 401(k) inv. approx. total of $32 mill. w/ CCI
- Local 11 Health and Welfare Trust inv. aprox. total of $9.2 mill. w/ CCI
- Local 9, Sheet Metal Pension inv. approx. total of $13 mill. w/ CCI
- Local 9, Sheet Metal Health inv. approx. total of $505,000 w/ CCI

Charged Uncharged Decisions

4 – Exhibit A

1200

5 – Exhibit A

**1998\***

Feb-Oct
Legal Fees
GK

4/7
Bronco
Tickets
JL

5/8
Rifle
RL

5/22
Fishing
Alaska
BN

7/17
Fishing
Alaska
JL

8/21
Hunting
Africa
RL, GK

9/18
Hunting
Clover Creek
DT

11/17
Hunting
Yellowstone
RL, GK, RM,
BN, DT

Feb. & May
Local 33, Tri-County
Health inv. $300,000
w/ CCI
DT

May
Local 33, Sheet Metal Pension
voted to inv.
$1 mill. w/ CCI
DT

Sep.
Local 9 Pension
inv. $3 mill. w/ CCI
JL

**\*END of 1998:**
- 8th Dist. Pension inv. approx. total of $46 mill. w/ CCI
- 8th Dist. Holiday Fund inv. approx. total of $2.1 mill. w/ CCI
- Local 11 401(k) inv. approx. total of $37 mill. w/ CCI
- Local 11 Health and Welfare Trust inv. approx. total of $9.4 mill. w/ CCI
- Local 9, Sheet Metal Pension inv. approx. total of $24 mill. w/ CCI
- Local 9, Sheet Metal Health inv. approx. total of $565,000 w/ CCI
- Local 33, Sheet Metal Pension inv. approx. total of $1 mill. w/ CCI
- Local 33, Tri-County Health inv. approx. total of $300,000 w/ CCI

Charged Uncharged Decisions

6 – Exhibit A

7 – Exhibit A

Jan.
Rifle
RL

Jan.
Rifle
RM

Feb.
8th Dist.
Pension inv.
$5 mill. w/
CCI
RL, RM, BN

3/22
Hunting
Argentina
RL, GK

5/23
Fishing
Alaska
GK

Jun.
Local 11 401(k)
Supported continuing
an inv. (Brooks Fin.) w/
CCI
GK

9/8
Hunting
Alaska
GK

2000*

**\*By September 21, 2000:**
- 8th Dist. Pension inv. approx. total of $75 mill. w/ CCI
- 8th Dist. Holiday Fund inv. approx. total of $2.4 mill. w/ CCI
- Local 11 401(k) inv. approx. total of $47 mill. w/ CCI
- Local 11 Health and Welfare Trust inv. approx total of $11 mill. w/ CCI
- Local 9, Sheet Metal Pension inv. approx. total of $35 mill. w/ CCI
- Local 9, Sheet Metal Health inv. approx. total of $682,000 w/ CCI
- Local 33, Sheet Metal Pension inv. approx. total of $1 mill. w/ CCI
- Local 33, Tri-County Health inv. approx. total of $877,000 w/ CCI

Charged Uncharged Decisions